# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BETTY S. FLYTHE,                                        :
                                                       :
        Plaintiff,                              :     Civil Action No.:    10-02021 (RC)
                                                       :
        v.                                      :     Re Document Nos.:   62, 63
                                                       :
DISTRICT OF COLUMBIA, *et al.*,                        :
                                                       :
        Defendants.                             :


## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART
### THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## I. INTRODUCTION

On December 26, 2009, Tremayne G. Flythe was fatally shot by an officer of the District of Columbia's Metropolitan Police Department ("MPD"). Mr. Flythe's mother, Betty S. Flythe, brought this action in her personal capacity and on behalf of the estate of Mr. Flythe against the District of Columbia ("the District") and the two officers directly involved in the shooting, Officers Travis Eagan and Angel Vazquez. The plaintiff has brought 42 U.S.C. § 1983 claims against the defendant officers, as well as common law claims for assault and battery, and wrongful death and survival. In addition, the plaintiff has asserted wrongful death and survival actions against the District for common law assault and battery, and for negligent hiring, training, and supervision. The defendants have all filed motions for summary judgment. For the reasons that follow, the Court will grant in part and deny in part the defendants' motions for summary judgment.

## II.  FACTUAL BACKGROUND

The events giving rise to this case began on December 26, 2009, when Balbir Singh Hundal ("Mr. Hundal"), the owner of Petworth Liquor Store on Georgia Avenue called the police to report that a man had thrown an empty bottle at Mr. Hundal's store window.  Def. Eagan's Statement of Undisputed Facts ¶ 22, ECF No. 62-2 ("Eagan's Statement").  Mr. Hundal had also called the police the day prior, reporting that the same man had thrown a brick through another store window, breaking it.  Eagan's Statement  ¶ 21.  MPD Officers Travis Eagan ("Officer Eagan") and Angel Vazquez ("Officer Vazquez") were both on patrol that day and Officer Eagan was the first to arrive at Mr. Hundal's store.  Eagan's Statement  ¶¶ 3-4.  He spoke with Mr. Hundal, who described the alleged brick-thrower as a black man with a "dreadlock hairstyle, walking a dog." Eagan's Statement  ¶ 4.  Officer Vazquez arrived in his police cruiser shortly thereafter, and Officer Eagan informed him of what had happened, including relaying Mr. Hundal's description of the suspect. Eagan's Statement ¶ 6.  Officer Eagan asked Mr. Hundal to accompany him in his police car and search the area to try to find the suspect, and Mr. Hundal complied.  Eagan's Statement ¶ 5.  Both officers then drove off separately to search for the suspect.  Eagan's Statement ¶ 7.

### A.  Officer Vazquez's pursuit

After Officer Vazquez left the store, he began to search the area in his patrol car and came across a male walking a dog on the 400 Block of Kenyon Street, who he claims he believed fit the suspect's description.  Def. Vazquez's Statement of Undisputed Facts ¶ 10, ECF No. 63-1 ("Vazquez's Statement").  After seeing the potential suspect, Officer Vazquez activated his car's lights and drove the wrong way down Kenyon, a one-way street, to approach the individual now known to be Tremayne G. Flythe.  *See* Vazquez Dep. at 16:3-6, ECF No. 63-4.  Officer Vazquez

claims that he parked his car near the curb, instructed Mr. Flythe to tie his dog to a fence pole in

front of the scout car, and asked if he could ask Mr. Flythe some questions.  Vazquez's

Statement ¶ 13.  After Mr. Flythe tied up his dog, Officer Vazquez got out of his car, and Mr.

Flythe asked him what was going on.  Vazquez's Statement ¶¶ 14-15.  Officer Vazquez replied

that he was just conducting an investigation.  Vazquez's Statement ¶ 15.  At this time, Officer

Vazquez and Mr. Flythe were walking toward each other, "going to meet." Vazquez Dep. at

23:20-22.  Officer Vazquez stated that shortly thereafter, they were standing next to each other,

facing the same direction with Officer Vazquez attempting to walk Mr. Flythe to the back of his

police car.  *See* Vazquez Dep. at 44:4-15.

Officer Vazquez claims that Mr. Flythe's demeanor at that point changed and he started

playing with his jacket.  *See* Vazquez Dep. at 21:21-22, 22:1-2.  Officer Vazquez then asked Mr.

Flythe if he "ha[d] anything on [him] that [he] should know" and in response, Mr. Flythe "said

yes and he pulled out a knife and he struck at [Officer Vazquez] with the knife in the right hand."

Vazquez Dep. at 22:2-5.  Officer Vazquez then stated that in response, "I think I kicked him or

pushed him . . . and I retrieved my weapon." Vazquez Dep. at 45:21, 46:2-3.  Vazquez then fired

two shots, and his gun jammed.  Vazquez Dep. at 48:7-8.  Vazquez testified that at that point,

Mr. Flythe was coming toward him with the knife, and Vazquez started running from him.

Vazquez Dep. at 48:11-12, 20-21.  Mr. Flythe eventually grabbed his dog, and ran off down

Kenyon Street.  Vazquez Dep. at 50:6-8.

Several bystanders witnessed the altercation between Officer Vazquez and Mr. Flythe

and offer contrasting versions of the events.  Mary Frances McCotter, a resident of Kenyon

Street, stated that she was on her front porch on the date in question, saw Officer Vazquez stop

Mr. Flythe on Kenyon Street, and that Mr. Flythe tied his dog to a fence and walked towards the

police car with his hands in the air, palms up.  McCotter Dep. at 11:20-22, 12:1-9, ECF No. 66-7.

She testified that she believed "he was going to put his hands on the police car."  McCotter Dep.

at 12:8-9.  According to Ms. McCotter, she heard Officer Vazquez shoot his gun at Mr. Flythe

and saw Mr. Flythe step back.  McCotter Dep. at 34:9-17.  She testified that Mr. Flythe did not

have a knife or any other weapon in his hands or waistband.  McCotter Dep. at 33:16-22.

Sabrina Shapiro, a passerby in her car, testified that she was driving down Kenyon Street

on the date in question.  Shapiro Dep. at 6-8, ECF No. 66-6.  She stated that she observed Mr.

Flythe walking down the street, that Officer Vazquez got out of his police car and exchanged

heated words with him, that Mr. Flythe rushed toward him and that Officer Vazquez drew his

firearm and started shooting.  Shapiro Dep. at 7:1-11.  She testified that Mr. Flythe approached

Officer Vazquez "in an aggressive manner" but with his hands open, and with no weapon.

Shapiro Dep. at 33:3-16.  Ms. Shapiro further testified that she later drove another block and

heard more shots.  Shapiro Dep. at 36:15-18.  She stated that she then pulled over, called her

father, an attorney, to ask if she could "call the police on the police," and then subsequently

called 911 and stated that she "had seen a police officer shooting an unarmed man."  Shapiro

Dep. at 38:9-12, 39:1-2.

Janean Willard, another resident of Kenyon Street, testified that she heard a gunshot,

looked out of her window, saw that Mr. Flythe was "defenseless," and that his hands were in the

air.  Willard Dep. at 7:16-18, ECF No. 66-8.  Ms. Willard testified that Mr. Flythe ran down the

street, that Officer Vazquez continued to fire at him, and that Mr. Flythe stopped and put his

hands in the air again and checked himself to see if he was hit.  Willard Dep. at 8:6-9. According

to Ms. Willard, Officer Vazquez was reloading his pistol during that time, Mr. Flythe grabbed

his dog and continued to run, and Officer Vazquez followed him and "continued to open fire."

Willard Dep. at 8:10-15.  She also stated that Mr. Flythe did not have a weapon, and that he had his hands in the air during the incident.  Willard Dep. at 11:9-14.

Another eyewitness, Jonathan L. Poole, observed the scene, and saw that Mr. Flythe's hands were up, his palms were forward, and that he had no weapon before Officer Vazquez shot at him.  Poole Dep. at 6:17-20, 8:4-8, ECF No. 66-9.  Mr. Poole stated that after Mr. Flythe began running away, the officer ran after him, still firing as he did.  Poole Dep. at 9:8-10.

Eyewitness Linda Smith testified that she saw Officer Vazquez shooting at Mr. Flythe, that Mr. Flythe backed away, and that she did not see Mr. Flythe have a knife or other weapon in his hands.  Smith Dep. at 5:4-17, ECF No. 66-10.  Linda Smith's daughter, Demetrius Moore testified that she saw Officer Vazquez shoot Mr. Flythe, and that during the shooting episode, she could not see whether Mr. Flythe had a weapon.  Moore Dep. at 10; ECF No. 70-6.  She also stated that she went to the basement out of fear for the remainder of the shooting.  Moore Dep. at 10.  She left the house to look at Mr. Flythe's body after he had been shot and saw no weapon on his body or near him.  Moore Dep. at 15-16.

### B.  Officer Eagan's pursuit

Meanwhile, Officer Eagan had been patrolling the same neighborhood, accompanied by Mr. Hundal.  As he was driving (and while Officer Vazquez was engaged with Mr. Flythe), Officer Eagan heard the following message come in over the police radio:

> OFFICER [Vazquez]: Eagan. Four hundred block of Kenyon.
>
> OFFICER: Hey (inaudible), copy.
>
> DISPATCHER: 3206 (phonetic).
>
> OFFICER: Drop the knife.
>
> OFFICER: Shot.

OFFICER: Drop the knife.

(Shot fired).

. . .

OFFICER: Tried to stab me, ma'am.  My gun jammed. Get official on this

location.

Def. Eagan's Mot. Summ. J., Radio Run Call 3:12-19, 4:8-9, ECF No. 62-6.

In response to this, Officer Eagan went around the block down until he was able to reach Kenyon Street, at which point he proceeded west down the street toward Georgia Avenue. Eagan Dep. at 25-26, ECF No. 63-5.  When he got to Water Street, he "made eye contact with Officer Vazquez" and recalls him saying that "he had been stabbed." Eagan Dep. at 26:15-16, 28:7-9.  Officer Eagan stated that he saw Officer Vazquez's "weapon out and he was pointing and saying he's running westbound, he's running westbound," at which point Officer Eagan looked down that block and saw Mr. Flythe.  Eagan Dep. at 29:9-16.  Eagan parked his car near the 600 block of Kenyon, in order to cut off Mr. Flythe.  Eagan Dep. at 32:16-20.  He left Mr. Hundal in his patrol car, and proceeded onto the sidewalk.

Officer Eagan claims that as he was stepping onto the sidewalk, Mr. Flythe ran right past him in close proximity, "proceeded past to pass [him] just a little bit" and ignored the officer's commands to "get on the ground."  Eagan Dep. at 33:1-7.  Officer Eagan thought he was going to engage in a running pursuit of Mr. Flythe, began to holster his weapon, and just as he did, "Mr. Flythe jumped through the air and changed his momentum by doing a hop, if you will, and started coming toward me." Eagan Dep. at 34:3-5.  Officer Eagan then stated that at that point, he began retreating and then "Mr. Flythe made a motion toward his waistband and I saw a silver blade of what I believed to be a knife coming up out of his waistband."  Eagan Dep. at 34:5-16.

Officer Eagan described how Mr. Flythe was holding his weapon as follows: "He [was] holding it in a fashion so that if the handle were—if the knife were vertical, the blade was pointing down and the handle up, he had the handle grasping it from the top so that if you were to bring your thumb back to your shoulder, handle would be toward your shoulder and the back of the knife would be forward of you." Eagan Dep. at 42:4-10. At that point, Officer Eagan stated that "I was ordering him to drop the knife, I'll shoot, drop the knife, I'll shoot. He continued to advance toward me. I discharged my weapon . . . ." Eagan Dep. at 43:16-20. Mr. Flythe went down and was taken to the hospital, where he died of a bullet wound to his chest. *See* Def. Vazquez's Mot. Summ. J., Autopsy Report at 3, ECF No. 63-8. The autopsy report revealed that Mr. Flythe had been struck by two bullets: one to the "front of [his] abdomen" and one to the "front of [his] right thigh." *Id.* The report explained that the gunshot wound to his abdomen "perforate[d] the underlying soft tissue entering the abdominal cavity beneath the ribs on the front of the chest." *Id.*

A knife was recovered near Mr. Flythe's body in the snow. *See* Def. Eagan's Mot. Summ. J., Bond Aff. ¶ 3, ECF No. 62-9. However, Mr. Flythe's fingerprints were not linked to the knife upon forensic analysis.[1] *See* Bond Dep. at 48:6-15, ECF No. 67-11.

The witnesses to the exchange between Officer Eagan and Mr. Flythe were Mr. Hundal,[2] Officer Vazquez, and Ursula Edmonds. Mr. Hundal testified that Officer Eagan parked his car, got out, and "was on the sidewalk running behind [Mr. Flythe]." Hundal Dep. at 65:16-18, ECF

---

[1]     The record shows that police investigators "swabbed" the handle of the knife for the presence of any trace matter of DNA, but it is unclear whether DNA was ever found on the knife. Raymond Bond testified that the DNA swabs were never sent for analysis, but he is not entirely sure why they were not. *See* Bond Dep. at 48, 49:1-3, ECF No. 63-7.

[2]     Mr. Hundal's recollection of what exactly happened is patchy. This is due in part to his poor English skills, and due in part to the fact that his vision of both Officer Eagan and Mr. Flythe was partially blocked by parked cars on Kenyon Street. *See* Hundal Dep. at 84:14-22, 85:1-10, ECF No. 62-7.

No. 67-3.  Mr. Hundal's testimony wavers; at one point, he stated that when the shots were fired, Mr. Flythe and Eagan were "face to face."  Hundal Dep. at 66:3, 91:8-10.  He also indicated that he saw them "come close" and saw Mr. Flythe "turn[] around."  Hundal Dep. at 89, 90.  At another point, however, Mr. Hundal stated that he could only see Eagan running behind Mr. Flythe and that the only time Mr. Flythe turned around (as Eagan stated he did) was when Mr. Hundal "heard the sound" of shots being fired.  Hundal Dep. at 90:9-14.  Mr. Hundal also stated that he did not see any weapon of any kind on the ground near Mr. Flythe's body.  Hundal Dep. at 74:13-15.

Officer Vazquez, meanwhile, testified that he was not sure whether Mr. Flythe had stopped running or not before Officer Eagan fired shots at him.  He stated, "I know he was not stopped but I don't know if he was running—walking, I mean, he was towards Officer Eagan."  Vazquez Dep. at 66:2-5.  He also stated that "prior to the shot [being fired]," he did not ever see Mr. Flythe stop running.  Vazquez Dep. at 63:7-11.

Ursula Edmonds, a bystander, testified that as soon as she saw Officer Eagan's car pull up, "the police officer . . . immediately jumped out of the car, ran, started running, and I saw him chasing another gentleman."  Edmonds Police Interview at 8:6-11, ECF No. 66-14.  She then stated, "he is chasing him and I heard, I hear two gunshots, pop, pop."  Edmonds Police Interview at 9:7-10.

### III.  ANALYSIS

The plaintiff filed this action against the officers pursuant to 42 U.S.C. § 1983, claiming that the defendants violated Mr. Flythe's Fourth Amendment right against an unlawful seizure by using excessive force.  The plaintiff also brings common law claims against the District of

Columbia and Chief Lanier[3] for negligent hiring, training, and supervision. In addition, the

plaintiff brings claims against the defendant officers individually, and against the District as the

officers' employer, for assault and battery. In response, all the defendants filed motions for

summary judgment. The Court turns to the parties' arguments and the relevant legal standards.

## A. Legal Standard for Rule 56 Motion for Summary Judgment

Summary judgment may be granted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the

litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if

sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving

party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In determining whether there exists a

genuine issue of material fact sufficient to preclude summary judgment, the court must regard

the non-movant's statements as true and accept all evidence and make all inferences in the non-

movant's favor. *See Anderson*, 477 U.S. at 255. A non-moving party, however, must establish

more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. It

---

[3]         The plaintiff originally named MPD Chief Cathy Lanier as a defendant in both her official and individual capacities. Am. Compl. ¶ 4, ECF No. 17. The defendants seek summary judgment on all claims against Chief Lanier, arguing that the plaintiff fails to produce any evidence that Chief Lanier was personally involved in, authorized, or approved the incident in question. *See* Def. Vazquez's Mot. Summ. J. 13, ECF No. 63. The defendants further contend that a suit against Chief Lanier in her official capacity is in actuality a suit against the District of Columbia and therefore duplicative. *Id.* at 14. The plaintiff states in her opposition that she no longer seeks to recover against Chief Lanier in her individual capacity, and agrees that a suit against Chief Lanier in her official capacity is in actuality a suit against the District. Pl.'s Opp'n to Def. Vazquez Mot. Summ. J. 1 n.1, ECF No. 67. The claims against Chief Lanier in her individual capacity are therefore dismissed, and the claims against her in her official capacity are collapsed with the claims against the District. *See Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) ("A section 1983 suit for damages against municipal officials in their official capacities is thus equivalent to a suit against the municipality itself."); *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 23 (D.D.C. 2012) ("it is duplicative to name both a government entity and the entity's employees in their official capacity").

must also designate specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party. *Id.* at 325.

"Although a jury might ultimately decide to credit the version of events described by defendants over that offered by the plaintiff, this is not a basis upon which a court may rest in granting a motion for summary judgment." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (internal quotations omitted). Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### B. Fourth Amendment & Qualified Immunity Claims (Count I)

The plaintiff's first claim is brought under 42 U.S.C. § 1983, alleging that the officer defendants employed excessive force against Mr. Flythe, in violation of his Fourth Amendment rights. In response, the defendants argue that they are entitled to qualified immunity because they exercised a reasonable amount of force in their encounters with Mr. Flythe. The Supreme Court has explained that there are two inquiries involved in a qualified immunity analysis: First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If there is no constitutional right violation, "there is no necessity for further inquiries concerning qualified immunity." *Id.* But if there is a constitutional violation, the court must ask the second question, which is: was the right violated "clearly established?" *Id.* If so, then the officer is not

entitled to qualified immunity; if the right violated was not clearly established at the time, then the officer is entitled to qualified immunity.[4]

The first question the Court asks, then, is whether the officers violated Mr. Flythe's Fourth Amendment rights. "To state a claim of excessive force under the Fourth Amendment, a plaintiff must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1219 (10th Cir. 2010) (emphasis added); *see also Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("Seizure alone is not enough for § 1983 liability; the seizure must be unreasonable."). The Supreme Court has addressed what constitutes a seizure several times in the last few decades. In *Terry v. Ohio*, the Court explained that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. 1, 19 n.16 (1968). Subsequently, in *United States v. Mendenhall*, the Court elaborated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. 544, 554 (1980). The Court went on to list (non-exhaustively) examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* Then, in *California v. Hodari D.*, the Court clarified both *Terry* and *Mendenhall* by explaining that "[a]n arrest requires *either* physical force *or*, where that is absent, *submission* to the assertion of authority." 499 U.S.

---

[4]    The Supreme Court has since made clear that the sequence of the two steps is now discretionary, not mandatory. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

621, 626 (1991) (emphasis in original).  Specifically, the Court explained that the *Mendenhall*

"free-to-leave" test "states a *necessary*, but not a *sufficient*, condition for seizure—or, more

precisely, for seizure effected through a 'show of authority.'" *Id.* at 628 (emphasis in original).

Thus, there are two ways to be "seized:" either by (1) means of physical force, or if there

is no physical force, (2) by a show of authority to which the person submits.  *See Brendlin v.

California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of

authority and without the use of physical force, but there is no seizure without actual submission;

otherwise, there is at most an attempted seizure . . . .").  The Seventh Circuit has said it the most

succinctly: "First, there must be either a show of authority or a use of force; and second, the

show of authority or use of force must have caused the fleeing individual to stop attempting to

escape."  *United States v. Bradley*, 196 F.3d 762, 768 (7th Cir. 1999).

With respect to when a seizure occurs by physical force, the Supreme Court has clarified

that a seizure only occurs "when there is a governmental termination of freedom of movement

*through means intentionally applied*."  *Brower*, 489 U.S. at 596-97 (emphasis in original).  In

addition, "there can be no question that apprehension by the use of deadly force is a seizure

subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471

U.S. 1, 7 (1985).

Lower courts have found that based on the foregoing Supreme Court precedent, "one can

reasonably conclude a 'seizure' requires restraint of one's freedom of movement and includes

apprehension or capture by deadly force."  *Brooks*, 614 F.3d at 1219.  "However, [those cases]

do not stand for the proposition . . . that use of deadly force alone constitutes a seizure.  Instead,

clear restraint of freedom of movement must occur."  *Id.  See also Reeves v. Churchich*, 484 F.3d

1244, 1252-53 (10th Cir. 2007) (holding that even though police officers "point[ed] their

weapons and ma[de] verbal commands," because one plaintiff ran away and the other pushed the officer's gun out of her face, they never submitted to the assertions of authority, and therefore, there was no seizure); *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994) (finding no seizure where an officer drew his gun at a suspect who subsequently fled, and explaining that "a seizure does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective"); *Cole v. Bone*, 993 F.2d 1328, 1332-33 (8th Cir. 1993) (holding that no seizure occurred where shots were fired at a truck but did not hit the suspect because they failed to produce a stop).

In the cases in which no physical force is applied, the D.C. Circuit has explained that "pursuant to *Hodari D.*," a court must determine (1) whether the officer "used a show of authority to seize" the person and (2) whether the person "submitted to the assertion of authority." *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992). Whether the officer used a show of authority to seize the person is an objective test based on *Mendenhall*: whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (quoting *Mendenhall*, 446 U.S. at 554). With respect to the second prong of the *Hodari D.* test, the Court has explained that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262.

With respect to the use of force in effectuating a seizure, the Supreme Court has stated that "a claim of 'excessive force in the course of making a seizure' of the person is properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Scott*, 550 U.S. at 381 (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). This Circuit has clarified that

"whatever the circumstances prompting law enforcement officers to use force, whether it be self-defense, defense of another, or resistance to arrest . . . the inquiry remains whether the force applied was reasonable." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993). "The 'reasonableness' inquiry is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their [subjective] underlying intent or motivation." *Graham*, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

With respect to the reasonableness of the use of deadly force, the Supreme Court has clarified that, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11. However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.

If the court finds that a constitutional right was violated, then the second question the court asks is whether the constitutional right was clearly established. The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. The Court undertakes this two-step inquiry with respect to each officer individually.[5]

### 1. Officer Vazquez

The first question the Court asks with respect to Officer Vazquez is whether he unlawfully "seized" Mr. Flythe. If the Court finds that there was no seizure, then there can be no claim of excessive force. The plaintiff admits, and the undisputed facts show, that Officer Vazquez did not actually apprehend Mr. Flythe by the use of physical or deadly force, but rather that it was only Officer Eagan who apprehended Mr. Flythe by the use of deadly force. *See* Pl.'s Opp'n to Def. Vazquez Mot. Summ. J. 2, 13, ECF. No. 67. In the absence of "termination of freedom of movement," *Brower,* 489 U.S. at 596-97, by physical force, there can only be a seizure if Officer Vazquez used a "show of authority" such that Mr. Flythe did not feel free to leave, *and* Mr. Flythe submitted to that show of authority. Officer Vazquez testified that he drove the wrong way down a one-way street, with his lights on, in order to approach Mr. Flythe. From his car, he asked Mr. Flythe to tie up his dog so that he could ask Mr. Flythe some questions. *See* Vazquez Dep. at 24:6-13. Mr. Flythe was compliant, and asked Officer Vazquez what was going on, to which Officer Vazquez replied that he was just conducting an investigation. Vazquez Dep. at 25:8-19. At this point, no "show of authority" had occurred, because based on those facts, there is no indication that a reasonable person would not have felt free to leave. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("law enforcement officers do not

---

[5]     The Court notes that while the defendants briefed the issue of municipal liability for the District of Columbia under § 1983, the plaintiff did not allege a § 1983 cause of action against the District in its Complaint or in its Amended Complaint (ECF Nos. 1 & 17, respectively). To the extent such a claim can be inferred from ¶ 14 of the Amended Complaint, the plaintiff waived the claim by not briefing the issue in opposition to the District's motion for summary judgment on this point. *See* Pl.'s Opp'n to Def. Vazquez Mot. Summ. J., ECF No. 67. Therefore, the Court does not address the District's potential § 1983 municipal liability and only undertakes a § 1983 analysis with respect to the individual officers.

violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen . . . ."); *United States v. Wylie*, 569 F.2d 62, 68 (D.C. Cir. 1977) (finding no seizure where "no physical force or physical contact of any kind was used to restrain appellant's freedom of movement" because "we believe that an innocent person in appellant's position would not have felt compelled to respond affirmatively to the officer's request for information."). Mr. Flythe was not cornered, or surrounded, but rather he was being asked questions by one officer on a public sidewalk in the middle of the day. Officer Vazquez had not yet displayed his weapon or touched Mr. Flythe, because he was in his car while Mr. Flythe was tying up his dog. *See* McCotter Dep. at 10:13-22, 11:1-3; Vazquez Dep. at 21:4-8. Those facts are not in dispute, and "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555.

Officer Vazquez testified that once the dog was tied up, he began to approach Mr. Flythe so as to walk him to the back of his police car. Vazquez Dep. at 40-41. According to Vazquez, Mr. Flythe's demeanor changed and at that point, he pulled out a knife and tried to stab Officer Vazquez with it. In response, Officer Vazquez "kicked or pushed him,"[6] pulled out his gun and fired two shots at Mr. Flythe. Vazquez Dep. at 45-46. When Officer Vazquez displayed his gun and fired shots, that was assuredly a "show of authority." *See Mendenhall*, 446 U.S. at 554 (noting that one factor indicating a show of authority is whether the police officer "displayed a

---

[6]     Officer Vazquez testified that he "kicked or pushed" Mr. Flythe shortly after his gun jammed. *See* Vazquez Dep. at 46:11-15, ECF No. 63-4. He later stated that Mr. Flythe kept coming toward him with the knife, but ultimately ran away. *Id.* at 48-50. There are no other eyewitnesses who saw if Officer Vazquez did kick or push Mr. Flythe. Regardless, such use of physical force did not restrain Mr. Flythe because he got up and ran away, and therefore he did not submit and was not seized at that point.

weapon"). But because his gun jammed, Mr. Flythe was able to escape. The record indicates that after Officer Vazquez's gun jammed, Mr. Flythe checked himself to see if he had been hit with a bullet, grabbed his dog, and started running. *See* Vazquez Dep. at 50:3-6; Willard Dep. at 8:6-9. Officer Vazquez eventually tried to chase Mr. Flythe down the block to no avail. In the whole altercation, Mr. Flythe was never seized by Officer Vazquez because he never submitted to the officer's show of authority.

The eyewitness testimony proffered by the plaintiff does not change this result because to the extent it creates any dispute of fact, it does not change the outcome in this case, and is therefore not material. A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson*, 477 U.S. at 248. One eyewitness testified that when she went out for a smoke on her porch, she saw a policeman (Officer Vazquez) say something to Mr. Flythe from his car, and then saw Mr. Flythe tie his dog to the fence. McCotter Dep. at 10-11, ECF No. 70-9. She then testified that Mr. Flythe "turn[ed] back around to the police officer and he comes toward the car with his hands like this," indicating that they were "palms up." McCotter Dep. at 11:20-22, 12:1-4. She testified that she was not sure what he was "showing" them to the police officer for, but that it appeared to her that "he was going to put his hands on the police car." McCotter Dep. at 12:7-9. She then stated that Mr. Flythe was walking toward the officer, and then she heard a "bou-beeng" sound that she claimed sounded like gunshots, and she saw Mr. Flythe step back, and that is when she saw Officer Vazquez get out of his car. McCotter Dep. at 13:7-18. She later explained that "he never got to the car, though, because he was standing there going towards it to put his hands up, when this man started shooting and he backed up . . . it appeared to be gunshots . . . the policeman did something." McCotter Dep. at 57:9-15. After

Officer Vazquez's gun jammed, "Tremayne grabbed his dog off the fence and he booked on down the street." *Id.* at 64:7-9.

Sabrina Shapiro, who was driving her car down the street at the time, stated that the interaction between Officer Vazquez and Mr. Flythe "all happened within less than a minute, that he [Officer Vazquez] started talking to him, got out of his car, was exchanging very heated words with him. The man rushes toward him. And the police officer immediately draws his firearm and started shooting." Shapiro Dep. at 7:4-11, ECF No. 70-10. She explained that she "specifically saw his hands as he [Mr. Flythe] advanced at the police officer and did not see a weapon in his hands." Shapiro Dep. at 32:8-10. She also stated that when she saw Officer Vazquez actually shooting at Mr. Flythe, "he was dodging. And that is when I saw his hands on the hood of the car." Shapiro Dep. at 36:5-6. She later stated that she saw "dodging and running around," and then there was nothing left to see as she proceeded to drive down the street. Shapiro Dep. at 37:4-11. The other eyewitnesses' testimonies also suggest that Mr. Flythe's hands were up before he began running down the street away from Vazquez. *See* Poole Dep. at 5-8; Willard Dep. at 19-20.

Viewing this testimony in the light most favorable to the plaintiff suggests that Officer Vazquez displayed a show of authority[7] to Mr. Flythe by shooting at him, and that Mr. Flythe put his hands up, or moved them toward the hood of Officer Vazquez's car in fleeting submission to that show of authority. However, the fact that Mr. Flythe was ultimately able to escape unscathed from the altercation with Officer Vazquez belies any contention that he was "seized" by Officer Vazquez. The undisputed evidence shows that he never submitted to

---

[7]     As set forth above, the use of deadly force alone, without a "clear restraint of freedom of movement" does not constitute a seizure. *See Brooks v. Gaenzle*, 614 F.3d 1213, 1219-1221 (10th Cir. 2010).

Vazquez's show of authority, but instead, fled. To the extent Mr. Flythe *momentarily* submitted

to a show of authority by either putting his hands up or moving them toward the hood of Officer

Vazquez's car, it did not render their encounter a seizure for purposes of the Fourth Amendment.

*See United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994) (holding that no seizure

occurred where the defendant "initially stopped" in compliance with a police officer's order, but

then "drove off quickly" before the police officer could reach the suspect's car). *See also Brooks*

*v. City of Aurora, Ill.*, 653 F.3d 478, 484-85 (7th Cir. 2011) (finding no seizure where officer

"placed his hand on [suspect's] wrist in an attempt to handcuff him, but [suspect] 'made a

jerking motion and broke free of [the officer's] grasp,'" and therefore even though there was a

restraint on the suspect's freedom of movement, he was not "detained significantly" at that

point); *United States v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011) ("Smith was not seized when

he initially hesitated and engaged in a short verbal exchange with Officer Dominguez," and then

subsequently fled); *Harris v. Smith*, 390 F. App'x 577, 580 (7th Cir. 2010) ("Here, Harris was

confronted with a display of authority and momentarily feigned surrender by beginning to drop

to his knees, but he quickly bolted for the door and managed to evade police . . . [a] defendant

who fakes compliance with an officer's orders and then flees the scene has not been seized, let

alone unreasonably so, for purposes of the Fourth Amendment."); *United States v. Smith*, 575

F.3d 308, 316 (3d Cir. 2009) ("Two steps towards the hood of a car does not manifest

submission to the police officers' show of authority."); *United States v. Baldwin*, 496 F.3d 215,

218-19 (2d Cir. 2007) (finding no seizure where the suspect's vehicle momentarily pulled over

but then subsequently sped off); *United States v. Valentine,* 232 F.3d 350, 359 (3d Cir. 2000)

("Even if Valentine paused for a few moments and gave his name, he did not submit in any

realistic sense to the officers' show of authority, and therefore there was no seizure until Officer

Woodard grabbed him.").[8]

[8] There are only a few cases finding that a momentary submission to authority is enough to constitute a seizure, and they are all distinguishable on the facts. *See United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006); *United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993); *United States v. Morgan*, 936 F.2d 1561, 1567 (10th Cir. 1991). In *Brown*, officers ordered Brown to stop because a robbery victim was being brought over to identify him as a possible suspect, and they demanded that he submit to a pat-down. 448 F.3d at 243, 246. The Court found that he submitted to the officer's show of authority because he turned to face the officer and placed his hands (or attempted to place his hands) on the officer's vehicle. *Id.* at 246. The Court found that his initial submission was a seizure, even though it was followed by a struggle, and an unsuccessful attempt to break away. *Id.* That case is distinguishable because even though Brown tried to flee, he was not ultimately successful in doing so, like Mr. Flythe was with respect to Officer Vazquez. In *Coggins*, the Court found that the suspect had submitted based on a totality-of-the-circumstances that are also distinct from Mr. Flythe's situation. There, the suspect expressed a desire to leave a police encounter at an airport. When he asked if he could leave to go to the bathroom, the officer told him to wait, and he sat back down. 986 F.2d at 652-53. Shortly after that, he stood up again and asked to go the bathroom immediately. He was again ordered to sit back down, and he did so briefly, but then walked off and began running. *Id.* The Court found that "[e]ven though he fled soon thereafter, the combination of Coggins' expressed desire to leave, [the agent's] order that he stay, and Coggins' yielding to police authority resulted in a seizure." *Id.* at 654. Those facts are different because there, Coggins complied twice with two police orders to sit down, and it was only *after* the second time that he yielded that he ran. Importantly, there, the suspect indicated his desire to leave the police encounter. In Mr. Flythe's case, he was fully compliant with Officer Vazquez's requests and questions and any fleeting submission to Officer Vazquez's show of authority (pointing his gun), was not tantamount to obeying police orders, like Coggins did. Finally, in *Morgan*, police officers followed a vehicle in which Mr. Morgan was a passenger for several blocks and then pulled in behind the vehicle when it made a stop. 936 F.2d at 1565. Mr. Morgan exited the vehicle, asked the officers a question, and then began backing away. *Id.* Mr. Morgan then began running. *Id.* There, the Court found that even though the initial attempted questioning of Mr. Morgan was minimally intrusive and Mr. Morgan ultimately fled, that "since Officer Eubanks had followed the car in which Defendant was a passenger for several blocks with his red lights flashing; since Officer Eubanks exited from a marked police car, in uniform, and asked the Defendant to hold up, and since Defendant had at least momentarily, *yielded* to the Officer's apparent show of authority," he had been seized. *Id.* at 1567 (emphasis in original). Again, those facts are different, because based on the totality-of-the-circumstances, Mr. Morgan submitted before fleeing, as did the car he was in when it stopped after being followed by the officer for several blocks. To the extent Mr. Flythe can be said to have submitted, it was for a fleeting period that, based on the totality-of-the-circumstances, was not a seizure as in *Coggins* and *Morgan*.

Because Officer Vazquez never "seized" Mr. Flythe, there can be no Fourth Amendment excessive force claim against him, and the Court must grant summary judgment to Officer Vazquez on this claim.

## 2. Officer Eagan

Officer Eagan's case is different. To begin, there is no question that Officer Eagan "seized" Mr. Flythe, because he shot and killed him and, as set forth above, "apprehension by the use of deadly force is a seizure subject to the Fourth Amendment reasonableness requirement." *Garner*, 471 U.S. at 7. Officer Eagan's recitation of the events, if true, would entitle him to use deadly force against whom he believed to be a dangerous suspect. The standard for the use of force, again, is whether an officer's actions are objectively reasonable in light of the facts and circumstances confronting him. *See, e.g.*, *Graham*, 490 U.S. at 396 ("[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene"). The facts available to Officer Eagan were as follows: a fellow officer (Vazquez) was out looking for the same suspect, and he heard a radio transmission in which Vazquez referred to the suspect having a knife and "try[ing] to stab" him. He also heard a gunshot over the radio, saw Officer Vazquez running with his weapon out and looking distressed. When he finally engaged Mr. Flythe (who at this point he thought was dangerous based on the radio transmissions and Officer Vazquez's armed pursuit of him), he ordered Mr. Flythe to stop. Mr. Flythe did not stop, but instead turned around, yelled, reached toward his waistband of his pants which contained a knife, and raised it up at him. Officer Eagan told Mr. Flythe to drop the knife and he did not; and Officer Eagan told Mr. Flythe to yield and he would not. In light of the facts confronting Officer Eagan at the time he fired his weapon, it was objectively reasonable for him to believe that Mr. Flythe posed a threat to him of serious physical harm. Officer Eagan acted as

a reasonable officer would have confronted with the same circumstances.[9]  *See Garner*, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").

The plaintiff contends that there is a genuine issue of material fact as to whether Mr. Flythe had a knife in his altercation with Officer Eagan.[10]  The plaintiff's claim can only survive

---

[9] Importantly, it was reasonable for Officer Eagan to rely on Officer Vazquez's radio transmissions and identification of the suspect. *See, e.g.*, *United States v. Hensley*, 469 U.S. 221, 231 (1985) ("Effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation of the transmitted information.") (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)). *Accord Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 24 (D.D.C. 2009). *See also Bilida v. McCleod,* 211 F.3d 166, 174–75 (1st Cir. 2000) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g., a warrant, probable cause, exigent circumstances).").

[10] The plaintiff also argues that Officer Eagan's state of mind was altered by his use of illegal drugs.  Pl.'s Opp'n to Def. Vazquez Mot. Summ. J. 13-19, ECF No. 67; Pl.'s Opp'n to Def. Eagan Mot. Summ. J. 8-13, ECF No. 66.  It is not clear from the record why those drugs were in Officer Eagan's system in the first place, or whether they had been in his system on the night of December 26, 2009.  Dr. Myron Weiner testified that the laboratory report dated December 31, 2009 "indicated positive results for amphetamine and methamphetamine that were obtained from the urine of Travis Eagan that was collected on December 30, 2009." *See* Weiner Dep. at 5:9-12, ECF No. 70-1.  However, Dr. Weiner also testified that those substances could have come from "legitimate sources" such as Adderall, for which Officer Eagan had a legal prescription, or Desoxyn, for which Officer Eagan also had a legal prescription. *See* Weiner Dep. at 6-9.  The Court makes no determination as to the truth of these allegations because whether Officer Eagan was under the influence of amphetamines at the time of his encounter with Mr. Flythe is irrelevant.  Based on the facts he confronted—a radio transmission alerting him to a fleeing suspect with a knife, who "tried to stab" another officer—Officer Eagan's use of deadly force was objectively reasonable and any reasonable officer in his position would have acted similarly.  The fact that his subjective mental state may have been impaired does not change the fact that based on the objective facts before him, he still acted as a reasonable officer would have in the situation. *See Graham*, 490 U.S. at 397 ("the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ."). *Cf.*

summary judgment as to Officer Eagan if the plaintiff shows that there is a *genuine* dispute of *material* fact on this issue. A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott*, 550 U.S. at 380. A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson*, 477 U.S. at 248. While the plaintiff has proffered evidence that casts doubt on *Officer Vazquez's* testimony on whether Mr. Flythe had a knife, the plaintiff has not done so with respect to *Officer Eagan's* testimony. The testimonies of the only eyewitnesses (Mr. Hundal, Mr. Vazquez, and Ms. Edmonds) who saw Mr. Flythe and Officer Eagan interact, while not necessarily corroborative of Officer Eagan's account, do nothing to put his version of events into material dispute—none of the eyewitnesses can say, or see, whether Mr. Flythe had a knife. Therefore, the Court must grant summary judgment to Officer Eagan on this issue; to defeat summary judgment, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

More importantly, whether or not Mr. Flythe actually brandished a knife against Officer Eagan is largely irrelevant, and therefore fails to create a genuine dispute of material fact. The standard under *Garner* is whether "there is probable cause to *believe* that [a suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm." 471 U.S. at 11-12 (emphasis added). Based on the radio transmission from Officer Vazquez that the suspect had a knife and "tried to stab me," along with the sound of gunshots fired, and Officer Vazquez's armed pursuit of Mr. Flythe, it was objectively reasonable for Officer Eagan to

---

*Woodham v. Dubas*, 256 F. App'x 571, 577 (3d Cir. 2007) (explaining that where the standard is whether a police officer acted objectively reasonably, "[e]vidence that [a police officer] was drunk . . . was not particularly relevant" to that inquiry if the objective facts show that the police officer acted reasonably).

believe that Mr. Flythe had a knife and was dangerous—whether or not he actually ever saw the knife himself (or whether or not the knife found near Mr. Flythe's body actually belonged to him). Mr. Flythe's failure to yield when confronted, in the face of what Officer Eagan reasonably perceived to be a dangerous situation, added to the objective reasonableness of Officer Eagan's use of deadly force on Mr. Flythe, regardless of whether he actually had a weapon. *See Sherrod v. Berry*, 856 F.2d 802, 807 (7th Cir. 1988) ("It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense at the time involved reasonably believed in the existence of such a danger . . . .") (internal citation omitted).

Officer Eagan may not have been a model police officer, but at this time, the plaintiff has not proffered evidence to put his recitation of the events into a *genuine*, *material* dispute with respect to his use of excessive force, and therefore, the Court must grant Officer Eagan's motion for summary judgment on the § 1983 excessive force claim. Because the Court finds there was no constitutional violation on these facts, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

### C. Negligent Hiring, Training, and Supervision (Count II)

The plaintiff next alleges that the District of Columbia was negligent in its hiring, training, and supervision of Officers Eagan and Vazquez. In the District of Columbia, liability under a theory of negligent supervision arises "when an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir. 2009) (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001)). To succeed on a claim of negligent supervision, the plaintiff

must prove "'that the employer breached a duty to the plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff.'" *James v. District of Columbia*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) (quoting *Phelan v. City of Mount Rainier,* 805 A.2d 930, 940 (D.C. 2002)).  In a typical negligence case under District of Columbia law, the "plaintiff has the burden of proving the applicable standard of care, the defendant's failure to meet that standard, and the causal relationship between that failure and the plaintiff's injury." *Godfrey*, 559 F.3d. at 572.  Under District of Columbia law, "if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson," the plaintiff must proffer expert testimony to establish the relevant standard of care.  *Id.*

Some courts have found that "expert testimony is generally necessary for claims of negligent training and supervision of police officers."  *Robinson v. District of Columbia*, Nos. 03-1455, 03-1456 (RCL), 2006 WL 2714913, at *8 (D.D.C. Sept. 22, 2006); *see also Briggs v. Wash. Met. Area Trans. Auth.*, 481 F.3d 839, 845-46 (D.C. Cir. 2007) (noting "that expert testimony is routinely required in negligence cases which involve issues of safety, security, and crime prevention") (internal quotation marks and citation omitted); *Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 207 (D.D.C. 2008) (holding that the plaintiff's proffering of an expert witness without articulating a standard of care was insufficient to withstand summary judgment on a common law negligent supervision claim).  However, this Circuit has clarified that expert testimony is not always "required to establish the standard of care in cases involving supervision . . . ." *Godfrey*, 559 F.3d at 572.  Rather, "as to the need for expert testimony, the factual context matter[s]." *Id.* at 573.  *See also Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000) (explaining that expert testimony is not necessary to establish negligence

when the conduct at issue is "persistent, open and notorious"); *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010) (holding that expert testimony is unnecessary where the case is not "a case in which lay jurors would be unable to grasp the issues without expert assistance"). Specifically, the cases finding expert testimony unnecessary are those "in which everyday experience makes it clear that jurors could not reasonably disagree over the care required." *Briggs*, 481 F.3d at 845. The decision whether to require expert testimony "is confided to the sound discretion of the trial court . . . ." *Varner v. District of Columbia*, 891 A.2d 260, 266 (D.C. 2006) (citing *District of Columbia v. White*, 442 A.2d 159, 165 (D.C. 1982)).

Importantly, in the cases involving negligent supervision of police officers where expert testimony was not required to establish the standard of care, the supervisory police officers were physically present on the scene and were negligent in supervising the subordinate officer during that officer's altercation with the plaintiff. *See, e.g.*, *Godfrey*, 559 F.3d at 573 (finding no expert testimony needed where supervisor who was present on the scene failed to stop its employee from committing wrongful act); *Daskalea*, 227 F.3d at 445 (requiring no expert testimony to discern that the District breached a duty of care owed to women prisoners by "fail[ing] to notice, let alone stop, a continuing series of evening stripteases, accompanied by blaring music, and guard-on-inmate violence"); *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 47-48 (D.D.C. 2012) (finding no expert testimony necessary to conclude that supervising officers were negligent when they allowed subordinates to arrest plaintiff without probable cause); *Tulin*, 994 A.2d at 795-798 (finding no expert testimony required where supervising officers watched subordinate officer effectuate arrest without probable cause, when they testified they knew there was no probable cause to make the arrest).

In contrast, in the cases requiring expert testimony, it was not obvious that the District as supervisor had done anything wrong, and therefore the plaintiff needed to establish a standard of care to serve as a benchmark for the defendant's behavior. *See, e.g.*, *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 115-116 (D.D.C. 2011) (finding that expert testimony was necessary to determine the standard of care as to whether officers need additional training when they are reported for incidents of unjustified shooting); *Linares v. Jones*, 551 F. Supp. 2d 12, 19-20 (D.D.C. 2008) (concluding that expert testimony was necessary to establish the "actual process used in reviewing police misconduct" and whether that standard was met); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 89-90 (D.D.C. 2000) (requiring expert testimony because otherwise the jury "would be forced to engage in [impermissible] 'idle speculation' regarding the duty of care governing [the defendants] in the training of their employees"); *White*, 442 A.2d at 164-166 (reversing the trial court's decision not to require expert testimony on a negligent training claim because the absence of such evidence "left the jury with unanswerable questions regarding the scope of the District's training program and the format, content, and frequency of an adequate training and retraining program"). The Court now turns to the District's liability with respect to each officer.

### 1. Officer Eagan

The first question the Court asks is whether the District knew or should have known that Officer Eagan "behaved in a dangerous or otherwise incompetent manner." *Godfrey*, 559 F.3d at 571. Here, the record shows that Officer Eagan's supervisors did express concern over his competence two months before the shooting incident with Mr. Flythe. Specifically, Lieutenant Madeline Timberlake drafted a memorandum to the MPD's Medical Services Division, requesting that Officer Eagan be subject to a fitness-for-duty physical because she "strongly

believe[d] that [he] should be evaluated mentally as well [as] physically to determine if he [was] capable of performing his duties at [the] time." Pl.'s Opp'n to Def. Eagan Mot. Summ. J., Fitness for Duty Memorandum, ECF No. 66-17. This concern stemmed largely from Officer Eagan's treatment for a sleep disorder, for which he was taking various medications. *Id.* In fact, Timberlake eventually ordered that Officer Eagan's police powers be revoked on October 15, 2009, when he did not show up for work and stopped responding to telephone calls. *See* Timberlake Dep. at 50:3-22, ECF No. 66-18.

The critical issue then becomes whether, in light of MPD's concerns about Officer Eagan, expert testimony is needed to determine whether MPD failed to adequately supervise him. The Court finds that this case is similar to the line of cases requiring expert testimony because lay jurors could "reasonably disagree over the [standard of] care required." *Briggs*, 481 F.3d at 845; *see also White*, 442 A.2d at 164-166.[11] The parties dispute whether MPD officials should have restored Officer Eagan's police powers without him first receiving a fitness-for-duty physical, per Lieutenant Timberlake's recommendation. *See* Timberlake Dep. at 54:10-11 (explaining that Officer Eagan's powers "should have remained revoked until they sent him for his fitness-for-duty physical"). The record indicates that Officer Eagan did not undergo a physical examination before his powers were restored, but rather only underwent a physical examination for the first time on December 30, 2009—two months after his powers were restored, and four days after the incident with Mr. Flythe. *See* Eagan Dep. at 51:10-22. David Jackson, the police official who authorized Officer Eagan's return on October 29, 2009, testified

---

[11]     Though the District did express concern over Officer Eagan's competence, this is not a case like *Daskalea*, *Tulin*, or *Wesby*, where government officials watched a subordinate behave in an obviously unlawful way and failed to do something about it. Rather, Officer Jackson restored Officer Eagan's police powers based on a Clinic report and psychological evaluation recommending that he do so—not based on any unlawful rationale.

that he did so based on a psychologist's recommendation contained in a Police and Fire Clinic Report authorizing that he be restored to "full duty." *See* Jackson Dep. at 31:18-19, ECF No.70-3. Without expert testimony on whether a police officer must undergo a fitness-for-duty physical (in addition to, or instead of, a psychological examination) before his police powers are restored, a juror is left to discern what the standard of care should be before a police department restores an officer to duty—a standard specific to the profession of law enforcement, and therefore beyond the ken of a reasonable lay person. Even though Officer Timberlake testified that Officer Eagan should have received a physical before returning to duty, without expert testimony on whether that was in, in fact, the standard of care, there is no way to discern whether the District met or fell below a baseline level of behavior, and therefore no way to discern whether the District failed to adequately supervise Officer Eagan.[12]

Moreover, there is nothing in the record to suggest that once Officer Eagan's police powers were restored, he acted in a manner that would have suggested that he needed extra supervision or care.[13] Even if there was, again the plaintiffs offer no expert testimony on what

---

[12] In addition, Felicia Lucas-Rahman testified that if Officer Eagan missed any physicals or rescheduled any medical appointments, the MPD "should have been notified" about it, which it was not. *See* Lucas-Rahman Dep. at 27:12-16, ECF No. 66-19. Again, without expert testimony as to whether the standard of care required that an officer receive a physical before being returned to duty, there is no way for a lay person to discern whether the District fell below that standard by not ensuring that Officer Eagan keep his appointments.

[13] Though the Court need not reach the issue, it doubts that the plaintiff would be able to show that the District's failure to supervise Officer Eagan proximately caused Mr. Flythe's death. *See James v. District of Columbia*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) ("[t]o succeed on a claim of negligent supervision, the plaintiff must prove that the employer breached a duty to the plaintiff to use reasonable care in the supervision or retention of an employee which *proximately caused* harm to the plaintiff.") (emphasis added). But-for causation may be established by the facts of this case, *i.e.*, but-for Officer Eagan being on duty that day, Mr. Flythe would not have been shot by Officer Eagan. Even so, whether proximate causation can be established is doubtful, because as set forth above, Officer Eagan acted as an objectively reasonable officer would have under the circumstances. And although Officer Eagan might not have shot Mr. Flythe that day, another reasonable officer likely would have.

the standard of supervision is when a police officer whose powers were revoked is restored to power. Therefore, because the plaintiff did not put forth expert testimony on the relevant standard of care as to the restoration of a police officer's powers and the subsequent supervision of that officer, the Court grants the defendant's motion for summary judgment on this issue.[14]

### 2. Officer Vazquez

As to Officer Vazquez, the plaintiff's claim against the District for negligent supervision cannot stand for two reasons. First, the plaintiff has not put forth any evidence that the District knew or should have known that Officer Vazquez was particularly dangerous or incompetent. Second, again the plaintiff has not put forth expert testimony that establishes the relevant standard of care for negligent supervision. The plaintiff's expert, Dr. Levin, did not mention the relevant standard of care for the supervision of a police officer, nor did his testimony even address Officer Vazquez's actions. *See* Levin Dep. at 25:3-22, ECF No. 67-12. Because there is

---

[14]    To the extent Dr. Levin's testimony served as expert testimony, it was not sufficient in establishing a standard of care. Dr. Levin only offered his expert opinion that any officer exhibiting the same symptoms as Officer Eagan, and who had not yet undergone a fitness for duty evaluation, should not have been "exposed to the public." Levin Dep. at 24:13-20, ECF No. 70-4. But expert testimony is not enough to establish a standard of care, "if it consists merely of the expert's opinion as to what he or she would do under similar circumstances." *Briggs*, 481 F.3d at 846 (quoting *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997)). "Rather, the expert must clearly articulate and reference a standard of care by which the defendant's actions can be measured." *Id.* Dr. Levin's deposition testimony that anybody that had such symptoms should have been referred for a fitness-for-duty evaluation established *his opinion*. *See* Levin Dep. at 25:21-22, 26:1 ("My opinion is that an officer with those conditions [exhibited by Officer Eagan as a result of his sleeping disorder] should be referred for a fitness-for-duty evaluation."). However, his opinion failed to reference materials used by other police departments or law enforcement agencies that establish a standard of care. *See generally* Levin Dep. His expert testimony therefore failed to sufficiently outline a standard of care by which the MPD's actions can be measured. *See Butera v. District of Columbia*, 235 F.3d 637, 660 (D.C. Cir. 2001) (expert sufficiently established a standard of care for undercover police operations because he "set forth concrete bases for his expert testimony," including consulting with a neighboring jurisdiction's police force, reviewing MPD's General Orders, examining a Department of Justice handbook on drug investigations, and examining a training manual from the Institute of Police Technology and Management of the University of North Florida).

nothing in the record to suggest that the District knew or should have known any of Officer

Vazquez's dangerous propensities (if he even had them) or incompetence (if he even was), and

because the plaintiff has not presented expert testimony on the standard of care for adequate

officer supervision, the Court grants summary judgment to the District with respect to him.[15]

## D. Assault and Battery (Count III)

The plaintiff also brings claims of assault and battery against the officers and the District.

An assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do

physical harm to the victim." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)

(internal citation omitted). A battery is "an intentional act that causes a harmful or offensive

bodily contact." *Id.* "[I]n most cases involving intentional shootings by police officers, there [is]

ample evidence to satisfy the elements of the tort of assault and battery, and the issue of liability

turns on the defense of privilege." *Id.* A police officer has a qualified privilege to use

reasonable force to effect an arrest, provided that the means employed are not "'in excess of

those which the actor reasonably believes to be necessary.'" *Etheredge v. District of Columbia*,

635 A.2d 908, 916 (D.C. 1993) (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 956

(D.C. 1980)). The privilege standard "is similar to the excessive force standard applied in the

§ 1983 context." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 28 (D.D.C. 2011) (internal

citations omitted).

---

[15] Because the plaintiff has not produced any evidence that the District was negligent in hiring or training either Officers Eagan or Vazquez (rather than supervising), and did not proffer expert testimony on the issue, the District's motion for summary judgment as to the negligent hiring and training claims is granted with respect to both officers as well.

The common law privilege to use deadly force under District of Columbia law—though similar—is slightly narrower than the excessive force analysis under the Fourth Amendment.[16] Under District of Columbia law, "[u]se of 'deadly force' . . . is lawful *only if* the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in *imminent peril of death or serious bodily harm*." *Etheredge,* 635 A.2d at 916 (emphasis added). The D.C. Court of Appeals has "specifically left open the question of who bears the burden [of proof] on the privilege issue" in battery and excessive force cases. *See Kotsch v. District of Columbia,* 924 A.2d 1040, 1048-50 (D.C. 2007); *District of Columbia v. Chinn,* 839 A.2d 701, 706 n. 3 (D.C. 2003). "Thus, the District must overcome this uncertainty by showing that it would be entitled to summary judgment even if it was saddled with the burden of proof." *Buraca v. District of Columbia*, 902 F. Supp. 2d 75, 81 (D.D.C. 2012). *See also Evans-Reid*, 930 A.2d at 939 ("We will assume, without deciding, that where a plaintiff establishes a prima facie case of assault and battery and the officer invokes the qualified privilege as an affirmative defense, the officer bears the burdens of production and persuasion."). In order to meet this burden of proof, "the government would have to show that [the officer] actually believed that he was in imminent danger of death or serious bodily harm when he used deadly force . . . and that his belief was

---

[16]        Several courts have recognized that excessive force claims under Section 1983 and common law battery claims, though similar, will not always yield the same result. *See, e.g.*, *Kotsch v. District of Columbia*, 924 A.2d 1040, 1047 n.7 (D.C. 2007) (explaining that the "underpinnings between the defense of qualified privilege against common law tort claims and qualified immunity from constitutional claims" are closely related but theoretically different); *Askew v. Millerd,* 191 F.3d 953, 958 (8th Cir. 1999) (an "assault and battery . . . may not constitute an excessive force"); *Haberthur v. City of Raymore*, 119 F.3d 720, 723 (8th Cir. 1997) ("Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability under it."); *Rogers v. Cofield*, No. 08-10684, 2011 WL 6140974, at *12 (D. Mass. Dec. 8, 2011) ("plaintiff correctly points out that the battery and the section 1983 excessive force claims are not mirror images").

reasonable under the circumstances." *Evans-Reid*, 930 A.2d at 938. Therefore, summary judgment is warranted on the assault and battery claims if it is undisputed that the officers "actually believed that [they were] in imminent danger of death or serious bodily harm" and that such beliefs were "reasonable under the circumstances." *Id.*

### 1. Officer Vazquez (individual capacity)

Though the bullets fired from Officer Vazquez's gun did not ultimately hit Mr. Flythe, Vazquez's attempts to hit him could still make him liable for assault. Officer Vazquez has not shown that it is undisputed that he "actually and reasonably believe[d]" that he was "in imminent peril of death or serious bodily harm," *Etheredge*, 635 A.2d at 916, when he used deadly force against Mr. Flythe. Officer Vazquez testified that Mr. Flythe had a knife and that he tried to "stab" him with it, which, if true, would make his use of deadly force against Mr. Flythe privileged, as he was acting in self-defense. However, five separate eyewitnesses testified that they all saw Mr. Flythe "with his hands in the air," and with no weapon throughout the encounter. *See, e.g.*, McCotter Dep. at 33:16-22, Smith Dep. at 5:4-17, Willard Dep. at 7:17-18. Thus, there is a genuine issue of material fact as to whether Mr. Flythe did, in fact, pose a threat of serious physical harm to Officer Vazquez, as a reasonable fact-finder could conclude based on the evidence proffered by the plaintiff that Mr. Flythe carried no weapon and did not otherwise threaten Officer Vazquez during their encounter. As such, there is a genuine issue of material fact as to whether Officer Vazquez was privileged to act when he "intent[ionally attempted] . . . to do physical harm" to Mr. Flythe. *Evans-Reid*, 930 A.2d at 937. Therefore, Officer Vazquez's motion for summary judgment on the common law assault claim is denied.

### 2. Officer Eagan (individual capacity)

Officer Eagan could be liable for common law assault and battery if he was not privileged to act, because he intended to cause "harmful or offensive bodily contact" to Mr. Flythe when he shot him. Here, as set forth above, the plaintiff has not proffered evidence to dispute Officer Eagan's reasonable belief, based on the radio transmission and surrounding events, that Mr. Flythe had a knife that put Officer Eagan and third-party members of the public in imminent peril of death or serious bodily injury. *Etheredge*, 635 A.2d at 916. Based on those undisputed facts, the Court finds that Officer Eagan was privileged to act, and therefore cannot be liable for battery.[17]

### 3. The District of Columbia

Under District of Columbia law, the District of Columbia can be vicariously liable based on a theory of *respondeat superior* for the unlawful actions of its officers committed in the scope of their employment.[18] *See Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 99 (D.D.C. 2008)

---

[17]     The plaintiff's eyewitness testimonies from Mr. Hundal, Officer Vazquez, and Ms. Edmonds *could* suggest, when viewed in the light most favorable to the plaintiff, that Mr. Flythe was running from Officer Eagan when he was shot. But their testimony is hesitant and inconclusive. The only conclusive evidence of the shooting, *i.e.*, the autopsy of Mr. Flythe's body, revealed that he was shot in the chest and the leg, and that the bullets entered his body from the front, and not the back. *See* Def. Vazquez's Mot. Summ. J., Autopsy Report, ECF No. 63-8 at 3.

[18]     The plaintiff brought suit against the officers in both their individual and official capacities. *See* Am. Compl. ¶ 5. To the extent the assault and battery claims are brought against the officers in their official capacities, those claims are dismissed as duplicative of the claims against the District. *See Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 44 n.19 (D.D.C. 2012) (dismissing the "state law claims asserted against the officers in their official capacities because such claims are duplicative of the claims asserted against the District of Columbia") (citing *Atchinson*, 73 F.3d at 424). The claims against them in their individual capacities, however, are not duplicative, because even under a theory of respondeat superior, the individual employees are still liable for their conduct. *See James v. District of Columbia*, 610 F. Supp. 1027, 1030 (D.D.C. 1985) ("[t]he imposition of vicarious liability upon the principal does not absolve the agents of the consequences of their own unlawful acts.") (quoting *Clark v. Atlantic Coast Line R.R.*, 244 F.2d 368, 372-73 (D.C. Cir. 1957)). *See also* RESTATEMENT (SECOND) OF

(quoting *White,* 442 A.2d at 162 n.7).  Thus, the District may be held liable for "the intentional torts of its employees acting within the scope of their employment." *Wade v. District of Columbia,* 310 A.2d 857, 863 (D.C. 1973) (en banc).  As the employer of both Officers Vazquez and Eagan, the District is responsible for the acts they committed in the scope of their employment.  Both officers were acting within the scope of their employment when they encountered Mr. Flythe, and Officer Eagan acted in reliance on representations by Officer Vazquez in his altercation with Mr. Flythe.  For purposes of assessing the District's liability for assault and battery, therefore, the Court must assess both officers' encounter with Mr. Flythe as a whole, constituting a single transaction.[19]

For the District to prevail on the assault and battery claim on a motion for summary judgment, it must be undisputed that both officers "actually believed that [they were] in imminent danger of death or serious bodily harm" and that such beliefs were "reasonable under the circumstances." *Evans-Reid,* 930 A.2d at 938.  As set forth above, there is a genuine dispute of material fact as to whether Mr. Flythe had a knife when he encountered Officer Vazquez, based on all the eyewitness testimony proffered by the plaintiff.  Although there is no eyewitness to contest Officer Eagan's version of events for purposes of the battery claim against *him individually*, no other witness testifies that they saw Mr. Flythe wield a knife against Officer Eagan.  *See* Hundal Dep. at 74, 84-86 89-91 (explaining that he did not see a weapon near Mr. Flythe's body after he had been shot, and that he could not see Mr. Flythe's hands during his

---

AGENCY § 359c(1) (1957) ("Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of an agent . . . and a judgment can be rendered against each.").

[19]    *Cf. Fenwick v. United States*, 926 F. Supp. 2d 201, 226-229 (D.D.C. 2013) (analyzing the plaintiff's excessive force claim from the perspective of *three officers* on the scene to properly determine whether they acted objectively reasonable, and finding that because the plaintiff posed a threat to only one of the officers and not all three, the defendants' actions "can be justified only as a response to the threat [the plaintiff] posed to [*one of the officers*]") (emphasis added).

encounter with Officer Eagan—just the top of his head, shoulders, and at times up to his waist); Vazquez Dep. at 66:7-20 (explaining that he saw Mr. Flythe "toward" Officer Eagan but did not see them engage in a physical struggle, or see Mr. Flythe take a fighting stance); Moore Dep. at 15 (explaining that when she looked at Mr. Flythe's body on the ground after he had been shot, "I didn't see a weapon in his hands" or near him).  In addition, Officer Eagan's description of the knife differs slightly from the photograph of the knife found near Flythe's body.  *Compare* Eagan Aff. ¶ 17, ECF No. 62-3 (describing the knife as having a "silver blade") *with* Def. Eagan's Mot. Summ. J., Ex. 12, ECF No. 62-12 (photograph of the knife recovered from the scene, with a brown-stained blade).  And, the knife found near Mr. Flythe's body was not linked to him in any way upon forensic analysis.  *See* Bond Dep. at 45, 48-49.  As to the District, who is responsible for the actions of *both* police officers, the disputes of fact concerning whether Flythe possessed a knife in his encounter with Officer Vazquez carry over to also create a dispute of fact as to whether he had one in his encounter with Officer Eagan—if a jury disbelieves Officer Vazquez and concludes that Mr. Flythe was unarmed at the beginning of the encounter, it is also entitled to disbelieve Officer Eagan as to whether Mr. Flythe was armed at the conclusion.

Moreover, for purposes of the District's liability, it must be undisputed that the officers *reasonably* believed that Mr. Flythe presented a danger.  The plaintiff has not proffered evidence to challenge the facts before Officer Eagan when he encountered Mr. Flythe, so for purposes of his individual liability, he did reasonably rely on Officer Vazquez's information.  However, because the plaintiff has proffered testimony that challenges the facts before Officer Vazquez, it is not undisputed—for purposes of the District's vicarious liability for *both* officers—that it was reasonable to rely on this information, given that a fact-finder could find that Mr. Flythe was not armed when Officer Vazquez approached him, and as such, Officer Vazquez either intentionally

or unintentionally conveyed false information to Eagan, leading Officer Eagan to incorrectly conclude that Mr. Flythe presented a danger to himself or others.  Where such factual disputes exist, summary judgment is not appropriate.  *See Wesby*, 841 F. Supp. 2d at 38-39 (denying the officers' motions for summary judgment because the defendants "failed to show, *by undisputed facts*, that it was objectively reasonable for the[] officers to rely on the information communicated by others at the scene . . . .") (emphasis added);  *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 67 (D.D.C. 2012) (denying qualified immunity to officers on the grounds that "a more complete factual record is required before the Court can determine whether . . . reliance [on a fellow officer's determination of probable cause] was reasonable").  Because there is a genuine dispute of material fact as to whether Mr. Flythe presented a danger throughout the encounter *with both officers* and the District is liable for the torts of both of its employees acting in the scope of their employment, the Court finds that summary judgment is not appropriate for the District on the assault and battery claim.

### E. Wrongful Death & Survival Actions (Counts IV & V)

Finally, the plaintiff brings claims against all the defendants under the District of Columbia's Wrongful Death Act and Survival Act.  *See* D.C. CODE § 16-2701 (2001); D.C. CODE §12-101 (2001).  "The Wrongful Death Act creates a cause of action in favor of the decedent's survivor only when the decedent's death 'is caused by a wrongful act . . . and the act is such as will, if death does not ensue, *entitle the person injured . . . to maintain an action and recover damage.*'" *Nelson v. Am. Nat. Red Cross*, 26 F.3d 193, 198 (D.C. Cir. 1994) (quoting *Greater Southeast Comm. Hosp. v. Williams,* 482 A.2d 394, 395 (D.C. 1984)) (internal citation omitted) (emphasis in original).  "Under the Wrongful Death Act, the wrongful act upon which

liability is premised must result in death before recovery may be had." *Finkelstein v. District of Columbia*, 593 A.2d 591, 617 (D.C. 1991).

Meanwhile, "the survival act . . . proceeds upon a different theory and foundation. It recognizes that liability to the victim should not be extinguished by the fortuitous event of death. The action provided for by the survival statute, therefore, does not arise from the death but from the injury itself." *Williams*, 482 A.2d at 397. "Under this Act, the rights of action which decedent would have had if he had lived are preserved. Recovery is restricted to what decedent would have recovered for the tort had death not intervened." *Finkelstein*, 593 A.2d at 618.

At this stage, the claims that remain are: the assault claim against Officer Vazquez individually, and the assault and battery claim against the District. The plaintiff can still maintain her wrongful death and survival claims against the District with respect to the assault and battery claim because the acts of one of its employees caused Mr. Flythe's death. Because Officer Vazquez's actions did not cause the death of Mr. Flythe, however, the plaintiff may not maintain a wrongful death action against him for assault. However, because the "action provided for by the survival statute . . . does not arise from the death but from the injury itself," the plaintiff may maintain a survival action against Officer Vazquez for assault because Mr. Flythe, had he lived, would have been able to maintain that cause of action against him. *See Williams*, 482 A.2d at 397.

Because the Court has granted all the defendants' other motions for summary judgment on all the other substantive claims, the plaintiff's wrongful death and survival actions with respect to those claims must also be dismissed.

## IV.  CONCLUSION

In sum, as to Officer Vazquez individually: the Court grants his motion for summary judgment on the constitutional excessive force claim, but denies his motion for summary judgment for common law assault;  as to Officer Eagan individually: the Court grants his motion for summary judgment on the constitutional excessive force claim and the common law assault and battery claim; as to the District: the Court grants its motion for summary judgment for the negligent hiring, training, and supervision of both officers, but denies its motion for summary judgment for common law assault and battery.

For the foregoing reasons, the Court grants in part and denies in part the defendants' motions for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  November 8, 2013                                    RUDOLPH CONTRERAS
                                                           United States District Judge