# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BETTY S. FLYTHE, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:  10-2021 (RC) |
| | : | |
| v. | : | Re Document No.:  84 |
| | : | |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION & ORDER

### GRANTING DEFENDANTS' MOTION IN LIMINE

## I.  INTRODUCTION & BACKGROUND

This case involves the fatal shooting of Tremayne G. Flythe on December 26, 2009.  The facts have been fully recounted in the Court's Memorandum Opinion dated November 8, 2013. *See* Mem. Op. at 2–8, ECF No. 72.  In that Memorandum Opinion, the Court granted in part and denied in part the defendants' motions for summary judgment.  Specifically, the Court granted the defendants' motions with respect to all but two claims: an assault claim against Officer Vazquez and an assault and battery claim against the District.  *See* ECF Nos. 71 & 72.  In an order amending that judgment in light of new controlling authority from the D.C. Circuit, this Court revived the plaintiff's claim for excessive force against Officer Vazquez.  *See* ECF No. 94. The issues that currently remain for the March 31, 2014, scheduled trial are: (1) whether Officer Vazquez used excessive force in his encounter with Mr. Flythe, in violation of 42 U.S.C. § 1983; (2) whether Officer Vazquez assaulted Mr. Flythe, and (3) whether the District, as the employer of both Officer Vazquez and Officer Eagan, is liable for an assault and battery committed against Mr. Flythe.

The defendants bring this motion *in limine* to exclude certain expert testimony and other evidence at trial. *See* ECF No. 84. Specifically, the defendants ask this Court to (1) exclude the expert deposition and trial testimony and report of Dr. Bronson Levin, (2) exclude the expert deposition and trial testimony and report of Dr. Myron Weiner, (3) exclude the trial testimony and report of Chief Timothy Longo, concerning the supervision and fitness for duty of Officer Eagan, and limit his testimony to the actions of Officer Vazquez and Officer Eagan in responding to the second sighting and the shooting incident itself; and (4) prohibit the examination of any witnesses, introduction or use of exhibits, or the elicitation of testimony or presentation of evidence of any kind relating to Officer Eagan's fitness for duty before or during the shooting incident, or his positive drug test and termination after the incident. *See* Def.'s Mot. 7–8, ECF No. 84. For the reasons that follow, the Court will grant the defendants' motion. In addition, the Court has decided four evidentiary issues that arose at the Pretrial Conference on March 10, 2014, and those are discussed below in Section E.

## II. ANALYSIS

### A. Legal Standard

"While neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly provide for motions *in limine,* the Court may allow such motions 'pursuant to the district court's inherent authority to manage the course of trials.'" *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984)). "Motions *in limine* are designed to narrow the evidentiary issues at trial." *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010). "Rule 103(d) of the Federal Rules of Evidence mandates that the court must conduct a jury trial to the extent practicable so that inadmissible evidence is not suggested to the jury by any means." *Daniels v. District of*

*Columbia*, No. CV 11-1331 (BAH), 2014 WL 535213, at *2 (D.D.C. Feb. 11, 2014) (citing FED. R. EVID. 103(d)). Importantly, a trial judge's discretion "extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial." *Barnes*, 924 F. Supp. 2d at 79 (quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 11 (D.D.C. 2011)).

"In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to Federal Rules of Evidence 401 and 402." *Daniels*, 2014 WL 535213, at *3. Under the Federal Rules of Evidence, "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "Unfair prejudice within its context means an undue tendency to suggest [making a] decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 175 (2013) (quoting Advisory Committee's Note, FED. R. EVID. 403); *see also Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (explaining that evidence is unfairly prejudicial "if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.") (citations omitted). Under Rule 403, "the court must 'engage in on-the-spot balancing of probative value and prejudice and . . . exclude even factually

relevant evidence when it fails the balancing test." *Daniels*, 2014 WL 535213, at *3 (quoting *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011)).

## B. Expert testimony of Drs. Weiner & Levin

The Court begins its analysis with the relevance of each of these expert reports. Dr. Weiner's expert toxicologist/pharmacologist report and deposition address Officer Eagan's use of methamphetamines or other drugs around the time of the shooting. *See* ECF Nos. 84-4 & 84-5. Dr. Levin's testimony meanwhile addresses Officer Eagan's fitness for duty on the day of the shooting. *See* ECF Nos. 84-1 & 84-3. Essentially, both experts testify to Officer Eagan's subjective mental state on the day of the shooting. But this information is not relevant to Officer Eagan's defense of qualified privilege, which in turn is available to the District as Officer Eagan's employer. As the D.C. Court of Appeals has explained, "an officer [] is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm. Use of deadly force, however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (internal quotation marks and citations omitted). The officer's judgment is "to be reviewed 'from the perspective of a reasonable officer on the scene,' with allowance for the officer's need to make quick decisions under potentially dangerous circumstances." *See Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)); *see also id.* ("This standard is similar to the excessive force standard applied in the Section 1983 context."). And, as the Supreme Court has explained in the excessive force context, "the reasonableness inquiry . . . is an *objective* one: the question is whether the officers' actions are *objectively reasonable* in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (emphasis added). Thus, any evidence regarding Officer Eagan's subjective judgment is not probative on the issue of the objective reasonableness of his actions.

Moreover, Officer Eagan's judgment is not at issue here. This is not a case where an officer confused a wallet for a gun. Here, both officers said Mr. Flythe had a knife, he tried to use it against both of them, and a knife was recovered from the scene. Witnesses say there was no knife, so the question of fact is whether both officers are lying, not whether they both misjudged another object for a knife or misjudged the situation in general.

Dr. Levin's testimony will not shed light, and therefore not have probative value on this issue. In his deposition, Dr. Levin stated that "I'm not going to be testifying specifically about the shooting, it's not an area for me . . . . I'm going to be testifying about, if I'm called, his capacity during the months leading up to the time period of the shooting, as well. So I can't answer your question about what actions he took that day that would indicate that." Levin Dep. at 15:2–11, ECF No. 84-3. He went on to state that his report "does not focus on any specific actions of Officer Eagan at the time of the shooting which caused [him] to believe that he was out of touch with reality or otherwise not mentally competent." *Id.* at 17:1–6. And when asked specifically about Officer Eagan's actions on the day of the shooting, he stated that he was not making any determination as to whether Officer Eagan "should or shouldn't have fired his weapon." *Id.* at 23:21–22. He also stated that Officer Eagan was aware of his circumstances, would have known if someone was attacking him with a knife, and was not psychotic. *Id.* at 24; *see also id.* at 36–37 (explaining that he did not believe that Officer Eagan was psychotic, insane, or hallucinating at the time of the shooting).

While Dr. Levin testified that due to sleep deprivation, Officer Eagan's "reaction time would be less, [his] processing of information would be poorer, [his] experience of threat would be higher . . . [his] ability to see alternative solutions would be lessened," Levin Dep. at 24:21-22–25:1-2, he could not and did not specify how Officer Eagan's processing of information was poor, or that his perception of a threat was incorrect, or that he should have acted differently in the circumstances he confronted. On the contrary, he stated that Officer Eagan would have known if someone attacked him with a knife, *see id.* at 24:5–7, and that it would be appropriate for an officer who is attacked with a knife to feel threatened. *Id.* at 28:20-22–20:1-2. In sum, he cannot say to a reasonable degree of professional certainty that Officer Eagan's capacity for perceiving a threat was impaired, and he cannot identify anything that Officer Eagan should have done differently. All he can conclude, in his opinion, is that Officer Eagan was not fit for duty based on various mental ailments and a sleep disorder he suffered from, and that Officer Eagan should not have been on duty the day of the shooting. *Id.* at 37:14–18. Though the plaintiff argues that she is entitled to illicit testimony for impeachment purposes regarding Officer Eagan's ability to recall the facts on the day of the incident, Dr. Levin's testimony would not be probative in this regard at all, because Dr. Levin has not questioned Officer Eagan's ability to recall the facts or his ability to observe the events on the day of the shooting as a result of drug use or sleep deprivation; though he states that Officer Eagan's processing of information would be poorer, *see* Levin Dep. at 24:21–22, that conclusory statement is not backed-up by any specific example as to how Officer Eagan poorly processed information on the day of the shooting. Nor is it substantiated with anything in his expert report. *See generally* Levin Rep., ECF No. 84-1. As such, Dr. Levin's opinion is not probative on the issue of Officer Eagan's reasonableness that day.

Meanwhile, Dr. Weiner did state in his expert report that he believed, based on the laboratory results, that "to a reasonable degree of pharmacological/toxicological certainty . . . Mr. Eagan's positive urine test for methamphetamine and amphetamine on December 30, 2009, was the result of his having used an illegal substance, methamphetamine, along with a legitimate prescription for Adderall XR (amphetamine); that this illegal use of methamphetamine was a substance abuse situation . . . ." Weiner Rep. at 3, ECF No. 84-5. However, in both that report and his subsequent deposition, he stated that the illegal methamphetamine detected could be the result of Officer Eagan taking 3-4 doses of Desoyxn, a medication for which Officer Eagan states he was given a starter pack. *Id.* at 2; Weiner Dep. at 9:21-22–10:1-25, ECF No. 84-4. And importantly, Dr. Weiner could not say to a reasonable degree of scientific certainty that Officer Eagan had used illegal methamphetamine, or any other drugs, *on the day of the shooting*. *See* Weiner Dep. at 18, 69. Thus, Dr. Weiner's inconclusive testimony on Officer Eagan's drug use would have no probative value on the ultimate issue of whether Officer Eagan was, in fact, threatened with a knife, and responded reasonably to such an attack.

And for purposes of impeaching Officer Eagan's ability to recall the facts or ability to observe events on the day of the shooting, Dr. Weiner testified that the drugs in Officer Eagan's system as of December 30, 2009 may have made him engage in "abnormal behavior" which he interpreted from a statement Officer Eagan had made about "time slow[ing]," *see* Weiner Dep. at 21:5–11, 35:6–22. But Dr. Weiner could not say specifically what abnormal behavior that was. And because he could not know for certain whether (legal or illegal) methamphetamine was in Officer Eagan's system at the time of the shooting, he could not say to a reasonable degree of scientific certainty whether Officer Eagan behaved abnormally or unreasonably on the day of the shooting, or whether he had not been able to perceive or recall the facts that confronted him.

In sum, the probative value of these experts' testimony on the issues of whether the officers were lying about seeing a knife and/or whether they acted reasonably if Mr. Flythe did in fact, threaten them with a knife, is very low. Indeed, Timothy Longo testified that "[i]f deemed credible, the version of events provided by both Officer Vazquez and Officer Eagan articulate circumstances that would have justified the use of deadly force by MPD policy, law, and generally accepted policing practices." Longo Rep. ¶ 72, ECF No. 84-6. Thus, the testimony regarding Officer Eagan's drug use would not assist the factfinder in determining whether Mr. Flythe had a knife, and if so, whether the officers acted reasonably in the face of such a threat, if it existed, because their actions, as even plaintiff's expert concedes, would be reasonable if their versions of the events were true.

Moreover, such testimony would be highly prejudicial and may confuse the jury into thinking that Officer Eagan's use of drugs is the real issue—when those facts have no probative value on the reasonableness of Officer Eagan's conduct at the time of the shooting. Courts have recognized that a witness' use of drugs is highly prejudicial and may be excluded when the witness' ability to perceive or recall facts is not legitimately at issue. *See, e.g.*, *United States v. Mojica*, 185 F.3d 780, 788–89 (7th Cir. 1999) ("Evidence of a witness' prior drug use may be admitted insofar as it relates to his possible inability to recollect and relate. However, we have recognized that there is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony. Thus, a district court may refuse cross-examination on the issue where memory or mental capacity is not legitimately at issue and the evidence is offered solely as a general character attack.") (internal quotation marks and citations omitted); *United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) ("Because of the extreme potential for unfair prejudice flowing from evidence of drug use,

this Court has held that such evidence may properly be limited to specific instances of drug use [during] relevant periods of trial and the transaction [at issue].  Furthermore, prior instances of drug use are not relevant to truthfulness for purposes of Fed. R. Evid. 608(b).") (internal quotation marks and citations omitted);  *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987) ("there is considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony.  A court must, therefore, be chary in admitting such evidence when it is offered for the sole purpose of making a general character attack.") (citations omitted);  *United States v. Kearney*, 420 F.2d 170, 174 (D.C. Cir. 1969) ("The issue of narcotics use is one that may properly be handled with some sensitivity lest it result in undue and unnecessary prejudice. There is an interest in avoiding undue evidentiary assault on prosecution witnesses. Prejudice may result if questions asked for the limited purpose of testing, say, opportunity to observe, are permitted to generate a hostility based on the general odium of narcotics use.") (citations omitted).

The D.C. Circuit's opinion in *United States v. Sampol* is instructive.  In that case, the court explained that "before the court will permit a witness to be questioned before the jury about his use of narcotics, counsel must *establish a foundation* showing either that the witness was using drugs at the time he observed the events in dispute, or that he is under the influence of narcotics while testifying.  Thus in the *Leonard* case we upheld a ruling by the trial court foreclosing any further inquiry into a witness's drug use after he testified that he had taken drugs neither on the day he observed the crime nor during the previous several months."  *Sampol*, 636 F.2d 621, 667 (D.C. Cir. 1980) (emphasis added) (citations omitted).  The court went on to conclude that the trial court did not abuse its discretion in barring any cross-examination inquiry into a witness' drug use because "defense counsel proffered only that the witness's father . . . had

informed counsel of [the witness's] addiction to drugs [and] [n]o offer was made to prove that [the witness] was influenced by narcotics during his testimony or at the time of the events which were subject to his testimony." *Id.* Similarly here, the plaintiff has not established a foundation showing that Officer Eagan was using illegal drugs at the time of the shooting. As set forth above, Dr. Weiner cannot say to a reasonable degree of scientific certainty that Officer Eagan had illegal methamphetamine in his system or used it, that day. *See* Weiner Dep. at 18–19. And Officer Eagan testified himself that he was not using "street drugs" or "getting high" on the day of the shooting. *See* Eagan Dep. at 73–74, ECF No. 95-1.

In the Court's discretion, it will bar the highly prejudicial and potentially confusing inquiry into Officer Eagan's drug use by Dr. Levin and Dr. Weiner. The danger of unfair prejudice and confusing the jury outweigh any probative value of this evidence, and as such, Dr. Weiner's and Dr. Levin's expert reports, depositions, and trial testimony will be excluded.

### C. Timothy Longo's testimony

The plaintiff also seeks to introduce Chief Timothy Longo's expert testimony regarding (1) the District's supervision of Officer Eagan, and (2) the reasonableness of Officer Vazquez's and Officer Eagan's use of deadly force on the day of the shooting. Because the Court entered judgment for the District on the negligent supervision claim, the District's supervision of Officer Eagan is no longer relevant, and Officer Longo's testimony as to that issue is therefore inadmissible. And again, any probative value of Officer Longo's testimony on the District's supervision of Officer Eagan would be unduly prejudicial and confuse the jury.

However, the District does not object to Officer Longo's testimony and opinion regarding police practices. Therefore, Officer Longo's testimony as to Officer Eagan's and Officer Vazquez's conduct on the day of the shooting will be admissible.

### D.  Officer Eagan's fitness for duty

The defendants finally request an order "excluding the examination of any witnesses, introduction or use of exhibits, or the elicitation of testimony or presentation of evidence of any kind relating to Officer Eagan's fitness for duty before or during the shooting incident or his positive drug test after the incident."  Def.'s Mot. 17, ECF No. 84.

For reasons similar to those regarding Dr. Levin's and Dr. Weiner's testimony, this request will be granted.  As set forth above, Officer Eagan's subjective state of mind is not at issue here.  While Officer Eagan's conduct is relevant for purposes of any defense the District might raise for assault and battery, any defense it could raise would be based on whether Officer Eagan "actually and reasonably believe[d]" that Mr. Flythe posed a threat of "imminent peril of death or serious bodily harm."  *Etheredge*, 635 A.2d at 916.  "This standard is similar to the excessive force standard applied in the Section 1983 context."  *Rogala*, 161 F.3d at 57;  *see also id.*  ("The officer's judgment is to be reviewed 'from the perspective of a reasonable officer on the scene,' with allowance for the officer's need to make quick decisions under potentially dangerous circumstances.") (quoting *Graham*, 490 U.S. at 396–97).  For the reasons set forth in the Court's Memorandum Opinion, *see* Mem. Op. at 21–24, Officer Eagan did act in an objectively reasonable fashion in using deadly force against Mr. Flythe because he reasonably believed that Mr. Flythe had a knife based on the transmission he heard on the radio run call, and his undisputed testimony that Mr. Flythe threatened him with a knife.  And, as the Court held, even if Mr. Flythe did not actually have a knife, "the plaintiff has not proffered evidence to dispute Officer Eagan's reasonable belief, based on the radio transmission and surrounding events, that Mr. Flythe had a knife that put Officer Eagan and third-party members of the public in imminent peril of death or serious bodily injury."  *See* Mem. Op. at 34.  As such, whether

Officer Eagan was under the influence of methamphetamines on the day of the shooting is irrelevant to the objective reasonableness inquiry. And moreover, such evidence would be highly prejudicial and likely confuse the jury into thinking that Officer Eagan's subjective mental state was the real issue, when, as set forth above, it was not.

To be sure, there are cases where the officer's subjective judgment may have some probative value as to whether his actions were objectively reasonable. *See, e.g.*, *Evans-Reid v. District of Columbia*, 930 A.2d 930, 934 (D.C. 2007). In *Evans-Reid*, for instance, the officer approached a car with his weapon drawn because he saw the passenger "lift up his shirt and pull out a gun." *Id.* Fearing for his life, the officer fired twice in the direction of the passenger and shot him dead. The gun turned out to be a BB gun, and the passenger a 14-year old boy. *Id.* Under such circumstances, whether the officer's judgment or mental state were impaired would be probative as to whether he was objectively reasonable in perceiving an imminent threat of death or serious bodily harm from a 14-year old wielding a BB gun. But such judgment-probing facts are not present here. On the objective facts before Officer Eagan (whether he was subjectively impaired or not), any reasonable officer would have responded to the radio run call transmission of "drop the knife" and "tried to stab me" with deadly force. As such, Officer Eagan's mental state and potential drug use is not relevant on the question of his objective reasonableness, and in turn, the District's liability.

Therefore, to reduce the likelihood of confusion or prejudice, any evidence as to Officer Eagan's mental state or drug use on the day of the shooting will be presumptively excluded. To the extent there is some legitimate impeachment[1] basis for raising the testimony, the plaintiff

---

[1] The plaintiff argues that if Officer Eagan is allowed to testify, his "credibility is subject to be examined just like any other witness." *See* Pl.'s Opp'n Mot. 6, ECF No. 90. The Federal Rules of Evidence provide the methods for impeaching the credibility of a witness,

must raise it at sidebar out of the presence of the jury. Finally, the jury will not be allowed to hear why Officer Eagan is no longer a member of the MPD, for the same reasons of prejudice and confusion, as set forth above.

### E. Other evidentiary issues brought up at the Pretrial Conference

#### 1. Autopsy Photographs

The defendants object to the admission of the autopsy photographs, on the grounds that they are "irrelevant, immaterial, inflammatory, and prejudicial." *See* Pretrial Statement 17. Courts have recognized that "[a]utopsy photographs can have immense probative value, if for example they confirm the prosecution's theory about the manner in which the crime was committed." *United States v. Rezaq*, 134 F.3d 1121, 1138 (D.C. Cir. 1998); *see also United States v. Cruz–Kuilan,* 75 F.3d 59, 61 (1st Cir.1996) (explaining that autopsy photographs confirmed witness's account of the crime, establishing that bullets fired by defendant had indeed passed through the body of the victim and injured the witness, and were therefore relevant); Michael Graham, § 401:7 Handbook of Federal Evidence 582–584, 605 (7th ed. 2012) (chronicling cases where autopsy photographs have been admitted to either aid pathologist's

---

which "include: (1) introducing prior inconsistent statements, (2) showing bias, (3) attacking the witness' character for truthfulness [under Federal Rule of Evidence 608], (4) attacking the perception or memory of the witness, and (5) contradicting the witness' testimony." *United States v. Collicott*, 92 F.3d 973, 980 n.5 (9th Cir. 1996) (citing McCormick on Evidence § 33 (1992)). *See also* Fed. R. Evid. 608 ("[a] witness's credibility may be attacked or supported by testimony *about the witness's reputation for having a character for truthfulness or untruthfulness*, or by testimony in the form of an opinion about that character." (emphasis added)); Advisory Committee Notes Fed. R. Evid. 608(a) ("In accordance with the bulk of judicial authority, the inquiry is strictly limited to character for veracity, *rather than allowing evidence as to character generally*. The result is to sharpen relevancy, to reduce surprise, waste of time, and confusion . . . .") (emphasis added). Officer Eagan is assuredly subject to cross-examination, but the cross examination must comport with the Federal Rules of Evidence. And, as set forth above, any evidence as to his subjective state of mind or drug use sought to be used for a legitimate impeachment purpose must be raised at sidebar out of the presence of the jury to avoid any issues of unfair prejudice or confusion.

testimony, explain the cause of death, or identify the victim). However, autopsy photographs also have the tendency to be prejudicial. *See Rezaq*, 134 F.3d at 1138 (explaining that "autopsy photographs are highly prejudicial, and [the circuit court] will not disturb a district court's decision regarding their admissibility 'absent a clear abuse of discretion'"); *see also Johnson v. Rankin*, No. 12-1414, 2013 WL 6224457, at *6 (4th Cir. Dec. 2, 2013) ("In light of the abuse of discretion standard and the prejudicial effect of autopsy photographs, we determine that the district court did not err in excluding the photograph, even if it had some probative value.").

At this stage, the Court cannot determine whether the probative value of the autopsy photographs outweighs their prejudicial effect. It is unclear for what purpose the plaintiff seeks to admit the photos. For instance, if the plaintiff introduces them to show pain and suffering with respect to the survival actions that remain, the photographs would offer probative value on that issue, which would likely outweigh their prejudicial effect. The photographs may also be relevant for purposes of identification, or for aiding the medical examiner's testimony. If, however, the plaintiff uses the photographs merely to arouse sympathy or passion, that would be inappropriate and prejudicial. Meanwhile, the photographs could have also probative value regarding any defense the District may use regarding Officer Eagan's shooting in self-defense. Because the Court has insufficient information at this time concerning the purpose for which either party will seek admission of the photographs, the Court will defer ruling on their admissibility until trial. *See Graves*, 850 F. Supp. 2d at 11 ("The trial judge has the discretion to rule *in limine* or to await developments at trial before ruling.") But, if the Court decides they are admissible, it will likely limit how many may be presented to the jury.

## 2.  The Knife

The plaintiff objects to the proffer of the wood handled knife recovered at the crime scene, as well as to the proffer of photographs of the knife recovered at the crime scene.  *See* Pretrial Statement 18.  The knife is a critical piece of evidence in this case.  Whether Mr. Flythe brandished a knife against one or both of the officers determines whether their use of deadly force against him was reasonable.  As such, the knife's probative value is important.  Its authenticity and its connection to Mr. Flythe is a pivotal issue for the jury to decide, and as such, it is admissible.  Of course, the plaintiff challenges whether the knife in evidence has any connection to Mr. Flythe, but this is a subject for cross-examination; it does not make the knife inadmissible.  *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof.").

## 3.  Radio Run Call

The plaintiff objects to the admission of the radio run call transmission and the radio run call transcript, on the basis of hearsay.  *See* Pretrial Statement 18.  Hearsay is defined as an out-of-court statement made for the purpose of proving the matter asserted.  FED. R. EVID. 801(c).  Federal Rule of Evidence 803 provides two exceptions relevant to the radio run call transmission: the present sense impression and the excited utterance.  A present sense impression is defined as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  FED. R. EVID. 803(1).  Meanwhile an excited utterance is defined as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  FED. R. EVID. 803(2).  The D.C.

Circuit has explained that "[f]or a statement to qualify as an excited utterance, the proponent of the exception must establish: (1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event." *United States v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003). "[U]nlike the hearsay exception for present sense impressions, an excited utterance need not be contemporaneous with the startling event to be admissible. Rather, the utterance must be contemporaneous with the excitement engendered by the startling event." *Id.* (internal quotation marks and citation omitted).

The statements made by Officer Vazquez on the radio run call satisfy either of these hearsay exceptions. Officer Vazquez called in to the dispatcher that he was on the "[f]our hundred block of Kenyon." Radio Run Call 3:12–13, ECF No. 62-6. His next statement on the call, moments or seconds later was "[d]rop the knife." *Id.* at 3:16. Seconds after that, he says "[t]ried to stab me, ma'am. My gun jammed. Get official on this location." *Id.* at 4:8–9. All of these statements happened within a very short amount of time, and while Officer Vazquez was interacting with Mr. Flythe, or just afterwards, as he was chasing him down the street. Thus, the statements were made both while Officer Vazquez was under stress of excitement from a startling event, and contemporaneously with the startling event, and therefore satisfy either exception. Courts confronting the admissibility of police radio call or 911 call transmissions have similarly held as such. *See Buraca v. District of Columbia*, 902 F. Supp. 2d 75, 81 n.2 (D.D.C. 2012) (explaining that "[t]he audio from these 911 calls would likely fall under one of two exceptions to the rule against hearsay: Rule 803(1)'s exception for 'present sense impressions' or Rule 803(2)'s exception for 'excited utterances.'"); *United States v. Mejia-Valez*, 855 F. Supp. 607, 613–614 (E.D.N.Y. 1994) (finding that 911 calls made two minutes after a

shooting and sixteen minutes after a shooting sufficed for purposes of contemporaneousness and qualified as present sense impressions; and if not, they still qualified as excited utterances); *United States v. Campbell*, 782 F. Supp. 1258, 1262 (N.D. Ill. 1991) ("The statements of Officer Schleder in the course of chasing and eventually arresting defendant also satisfy the three conditions necessary to application of the present sense impression exception to the hearsay rule."); *United States v. Morrow*, No. CRIM.A. 04-355CKK, 2005 WL 3163803, at *3 (D.D.C. June 9, 2005) ("courts across a multitude of jurisdictions . . . have collectively concurred that audio tapes and written logs of 911 calls, telephone calls, and police dispatches are admissible under the present sense impression and excited utterance exceptions to the hearsay rule").

The radio run call transcript, meanwhile, fits the business records exception to hearsay. FED. R. EVID. 803(6); *see also United States v. Smith*, 521 F.2d 957, 962–64 (D.C. Cir. 1975) ("we see no reason to exclude a police record made in the regular course of business, it being the regular course of police work to make the record at issue. Thus . . . the radio broadcast transcript [was] properly admissible as [a] business record[] upon a showing of [its] trustworthiness."); *Vasquez v. McPherson*, 285 F. Supp. 2d 334, 338 (S.D.N.Y. 2003) ("The radio logs and the transmission transcript are business records that would be admissible at trial pursuant to Fed. R. Evid. 803.").[2]

### 4. Lost services expert testimony

Finally, at the pretrial conference, there was a dispute as to whether the plaintiff must proffer expert testimony for loss of services as a result of Mr. Flythe's death. The District of

---

[2]     Though the transmission or transcript or both may be lengthy, the Court nevertheless finds that both pieces of evidence qualify in their entirety as present sense impressions, even if the dialogue at some point ceases to qualify as an excited utterance. To the extent any parts of the transmission or the transcript no longer become relevant, *i.e.*, after the shooting takes place, the Court defers ruling on redacting them until trial.

Columbia Court of Appeals has explained that "[t]wo main elements form the basis for recovery under the Wrongful Death Act.[3] The first element compensates for pecuniary loss—calculated as the annual share of decedent's dependents in the decedent's earnings, multiplied by the decedent's work life expectancy, and discounted to present value." *Doe v. Binker*, 492 A.2d 857, 863 (D.C. 1985). "The second element compensates for the value of the services lost to the family as a result of the decedent's death." *Id.* Thus, there are two types of wrongful death damages: financial loss and loss of services. *See id.*; *see also Weil v. Seltzer*, 873 F.2d 1453, 1466 (D.C. Cir. 1989) ("Under the wrongful death act the jury must determine the portion of the decedent's income that went for the support of his beneficiaries each year; that figure is then multiplied by the decedent's work-life expectancy or the beneficiary's life expectancy, whichever period is shorter, and then discounted to present value. *In addition*, the appropriate family members are compensated for the *value of services lost* to the family as a result of the decedent's death") (emphasis added); *Herbert v. District of Columbia*, 808 A.2d 776, 778 n.2 (D.C. 2002) ("Recoverable damages under this Act include: (1) pecuniary losses resulting from the loss of financial support the decedent could have been expected to provide the next of kin had he lived; and (2) the value of lost services (e.g., care, education, training, and personal advice)" (citations omitted)). Under the D.C. model jury instructions, both of these figures

---

    3    Meanwhile, the District of Columbia Court of Appeals has found that "[t]he Survival Statute does not purport to compensate individual members of the decedent's family for *the loss of the economic benefit which they might reasonably have expected to receive from the decedent in the form of support, services or contributions* during the remainder of his lifetime. Nor does it seek to compensate family members for the lost incidents of family association or the grief they have suffered." *Hughes v. Pender*, 391 A.2d 259, 261 n.2 (D.C. 1978) (emphasis added). Rather, "damages are limited to compensation to the estate itself for the loss of prospective economic benefit in the form of the decedent's prospective net lifetime earnings discounted to present worth." *Id.* at 261 (quoting *Runyon v. District of Columbia*, 463 F.2d 1319 (D.C. Cir. 1972)). Thus, the loss of services analysis is only relevant for purposes of the wrongful death claim that remains, which is the assault and battery claim against the District.

should be discounted for present value and the case law generally undertakes such an analysis. *See* D.C. Std. Civ. Jury Instr. No. 14-5 ("The amount you calculate as the net financial loss *must then* be discounted to present cash value. This means that you must determine a lump sum payment which could compensate each beneficiary for his or her future financial losses suffered as a result of the deceased's death.") (emphasis added).

Under District of Columbia law, "[n]ot every element of damages warrants the use of expert testimony, and the decision to admit expert testimony lies within the sound discretion of the trial court." *District of Columbia v. Barriteau*, 399 A.2d 563, 568 (D.C. 1979). "To warrant the use of expert testimony, the subject dealt with must be so related to some science, profession, business or occupation as to be beyond the ken of the average layman, and the expert witness must have knowledge of the subject area sufficient to aid the trier of fact in its search for the truth." *Hughes v. Pender*, 391 A.2d 259, 262 (D.C. 1978). Several courts have found that discounting to present value[4] "falls within the class of tasks which lend themselves to clarification by expert testimony because they involve the use of statistical techniques and require a broad knowledge of economics." *See Schleier v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, 876 F.2d 174, 179 (D.C. Cir. 1989); *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 95 (D.D.C. 2012) (noting that under *Schleier*, "juries generally need expert guidance on discounting to present value").

Nevertheless, the Court has not found any case that has explicitly *held* that expert testimony is *required*, and D.C. courts have cautioned that "[e]xpert economic testimony in a wrongful death case represents only a guideline and may not be adopted at its face value as the sole basis for the determination of damages for death." *Thomas v. Potomac Electric Power Co.*,

---

[4] Not necessarily in the context of a wrongful death damages calculation, but in the context of damages generally.

266 F. Supp. 687, 695 (D.D.C. 1967); *see also id.* ("Actuarial testimony as to possible or probable future earnings of the deceased, *and the reduction of the aggregate amount to present worth*, is admissible and is generally presented in cases of wrongful death of an adult breadwinner of a family. It is, however, far from conclusive. Such evidence is only the starting point and not the terminus of the inquiry.") (emphasis added); *Doe*, 492 A.2d at 864 ("In wrongful death actions, 'the amount of damages to be awarded must be based largely on the good sense and sound judgment of the jury . . . and all the facts and circumstances of the case.'") (quoting *Rankin v. Shayne Brothers, Inc.*, 234 F.2d 35, 36–37 (D.C. 1956)); *see also id.* at 863–864 (explaining that the loss of services such as preparing meals for family, taking children to sporting events and doctor appointments, performing home repairs, grocery shopping, and other such activities, "*cannot be quantified with mathematical precision*") (emphasis added).

And moreover, courts vary as to whether they require expert testimony to discount loss of services to present value. *Compare Burton v. United States*, 668 F. Supp. 2d 86, 112–13 (D.D.C. 2009) (explaining, without addressing issue of whether expert testimony is required to do so, the expert's computation for loss of value of household services as follows: the expert estimated the value of the loss of services such as household repairs and maintenance, outdoor work, dishwashing, laundry and the like, at $13 per hour; assumed 20 hours of service per week, for 50 weeks per year, with a 4% discount rate and a 16.9 year life expectancy to arrive at a total of $219,700); *Graves v. United States*, 517 F. Supp. 95, 100 (D.D.C. 1981) (explaining, without addressing issue of whether expert testimony is required to do so, that plaintiff's expert witness valued the services lost to the family such as cooking dinner, teaching his sons his trade, grocery shopping, and household repairs at $3.50 per hour (minimum wage plus 5% increase per year), at 12 hours per week, for the full life expectancy for a total of $35,542, but finding that $7500 is the

more reasonable figure given that these household services would no longer be necessary once the decedent's children reached age 18); *Athridge v. Iglesias*, 950 F. Supp. 1187, 1193 (D.D.C. 1996), *aff'd*, No. 96-7261, 1997 WL 404854 (D.C. Cir. June 30, 1997) ("demonstrated earning capacity and actual future earning capacity were reduced by the expert witness to their present value using a valid discount rate."); *and Croley v. Republican Nat. Comm.*, 759 A.2d 682, 690 (D.C. 2000) (projecting plaintiff's lost earnings on the basis of expert testimony), *with District of Columbia v. Jackson*, 810 A.2d 388, 398 (D.C. 2002) (not assessing wrongful death damages on the basis of expert testimony but explaining that the limited proof of services, care, guidance, and training the decedent provided the plaintiff warranted remittitur of a $2,146,998 compensatory damages award to $180,000); *Doe*, 492 A.2d at 863–864 (no expert testimony used as to loss of family services such as preparing meals for the family, taking children to the doctor and sporting events, home repairs, grocery shopping and other activities because "the loss of these services cannot be quantified with mathematical precision"); *Sutton v. Washington Metro. Area Transit Auth.*, No. CIV.A. 07-1197 JDB, 2008 WL 8822521, at *1 (D.D.C. Aug. 27, 2008) ("Finally, although loss of services (e.g., care, education, training and guidance) is recoverable, plaintiff will be presenting ample first-hand lay testimony from those who have known both Aubria Walters and her deceased mother well over many years; the testimony of a medical expert based on a few hours with Aubria will not assist the trier of fact on this subject, which is within the knowledge of lay persons (i.e., the jury).").

In light of the foregoing, the Court, in its discretion, will not require expert testimony as to the value of the loss of services for purposes of the wrongful death damages calculation. However, as to the discounted present value, the Court will implement, in accordance with D.C. Standardized Jury Instruction No. 14-5, the following instruction: "For each beneficiary, you

must figure the amount, which if invested at a particular rate of interest today over the number of years the decedent would have been expected to live, would return an amount equal to the net financial loss to that beneficiary." The Court will also use the life expectancy instruction found in D.C. Standardized Jury Instruction No. 13-10 for that calculation.[5]

## III. CONCLUSION

For the foregoing reasons, the defendants' motion *in limine* is GRANTED. It is hereby ORDERED that

(1) Dr. Levin's and Dr. Weiner's expert reports, depositions, and testimony is **excluded**;

(2) Chief Timothy Longo's testimony will be **limited** to his opinions on the actions of Officer Vazquez and Officer Eagan in responding to the second sighting and the shooting incident itself; and he may not testify on the negligent supervision or fitness for duty issues;

(3) The examination of any witnesses, introduction or use of exhibits, or the elicitation of testimony or presentation of any kind relating to Officer Eagan's fitness for duty before or during the shooting incident, or his positive drug test and subsequent termination, are **presumptively excluded**. To the extent any of the above is sought to be used for a legitimate impeachment purpose, it will be addressed by the Court and the parties at sidebar, out of the hearing of the jury.

(4) The reason Officer Eagan is no longer a member of the MPD is **excluded**;

(5) The Court **defers ruling** on the admissibility of the autopsy photographs until trial;

(6) The knife and photographs of the knife **are admissible**;

(7) The radio run call transcript and transmission **are admissible**;

---

[5]     Of course, because the defendants are presenting expert testimony on economic loss, they are free to elicit expert testimony on this topic, as well as the appropriate calculations.

(8)  Expert testimony **<u>is not required</u>** for the loss of services damages calculation.

SO ORDERED.


Dated:  March 25, 2014                                RUDOLPH CONTRERAS
                                                      United States District Judge