**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| BETTY S. FLYTHE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 10-2021 (RC) |
| | : | | |
| v. | : | Re Document No.: | 150, 151 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**Denying Defendant Eagan's Motion for Summary Judgment and Denying
Defendant Eagan's Motion for Summary Judgment as to Punitive Damages**

## I.  INTRODUCTION

On December 26, 2009, an officer of the District of Columbia's Metropolitan Police

Department ("MPD") fatally shot Tremayne G. Flythe.  Mr. Flythe's mother, Betty S. Flythe,

brought this action in her personal capacity and on behalf of the estate of Mr. Flythe against the

District of Columbia ("the District") and the two officers directly involved in the shooting,

Officer Travis Eagan and Officer Angel Vazquez.  Against the officers, Ms. Flythe alleged

constitutional excessive force claims under 42 U.S.C. § 1983 and common law assault and

battery claims.  At summary judgment, the Court concluded that qualified immunity shielded

Officer Eagan from Ms. Flythe's section 1983 and assault and battery claims and, consequently,

granted summary judgment in his favor.  *See generally Flythe v. District of Columbia* (*Flythe I*),

994 F. Supp. 2d 50, 66–68, 74 (D.D.C. 2013).  The Court allowed Ms. Flythe's claims against

Officer Vazquez and some of her claims against the District to proceed to trial, however, *see*

*generally id.*; *Flythe v. District of Columbia* (*Flythe II*), 4 F. Supp. 3d 216 (D.D.C. 2014), and a

jury found Officer Vazquez liable for assault (but not battery or excessive force), and found the

District of Columbia liable "for assault and battery, for the actions of *both* Officer Vazquez and Officer Eagan," Jury Verdict, ECF No. 117 (emphasis added).

On appeal, the D.C. Circuit affirmed the jury verdict in all respects, but reversed the entry of summary judgment against Officer Eagan. *See Flythe v. District of Columbia* (*Flythe III*), 791 F.3d 13, 15 (D.C. Cir. 2015). On remand, Officer Eagan has again moved for summary judgment, arguing that notwithstanding the D.C. Circuit's decision, summary judgment should be granted in his favor in light of the record produced at trial. The Court disagrees, both because the circuit *did* have the trial record before it and also because, in any event, genuine issues of material fact remain even after considering the trial testimony. Accordingly, the Court will deny both of Officer Eagan's motions. The Court does conclude, however, that the District of Columbia's liability was settled by the first trial—which has now been affirmed on appeal. As a result, this case will proceed against Officer Eagan, alone.

## II. FACTUAL BACKGROUND

The Court and the D.C. Circuit have previously described the facts surrounding Mr. Flythe's death on December 26, 2009 in detail. *See Flythe III*, 791 F.3d at 15–18; *Flythe I*, 994 F. Supp. 2d at 55–59. The Court assumes familiarity with those prior opinions and will focus on the facts most relevant to Officer Eagan's present motions for summary judgment.

On December 26, 2009, the owner of Petworth Liquor Store, Balbir Singh Hundal, called the police to report that a man had thrown an empty bottle at his store's window. *See* Def. Eagan's Statement of Material Facts ¶ 3 ("Def.'s SUMF"), ECF No. 150-2.[1] Mr. Hundal had

---

[1] In many instances, Ms. Flythe's counterstatement of material facts simply contends that a particular fact is not material, but does not otherwise contest or deny the fact. *See, e.g.*, Pl.'s Resp. to Def. Eagan's Alleged Stmt. of Undisputed Material Facts ¶¶ 2–3 ("Pl.'s SUMF"), ECF No. 158-1. In these instances, the Court considers the facts admitted. *See* D.D.C. Local Civ. R.

called the police the evening prior to report that the same man had thrown a brick through, and broken, another store window. *Id.* ¶ 1. District of Columbia Metropolitan Police Department Officers Angel Vazquez and Travis Eagan arrived at Mr. Hundal's store and then set off, separately, to canvass the neighborhood assisted by Mr. Hundal's description of the individual as a "black male wearing a black jacket, [and] walking a dog." *Id.* ¶¶ 5, 9; *see also* J.A. at 1756 (Mr. Hundal's trial testimony).[2]

Officer Vazquez came across a male walking a dog on the 400 Block of Kenyon Street, who he claimed fit Mr. Hundal's description. J.A. at 362 ¶ 10 (Def. Vazquez's Stmt. of Undisputed Facts). That man was Tremayne Flythe. After parking his vehicle near the curb, Officer Vazquez instructed Mr. Flythe to tie his dog to a fence pole, and inquired whether he could ask Mr. Flythe some questions. *Id.* ¶ 13. Mr. Flythe and Officer Vazquez then moved to the rear of Office Vazquez's cruiser. Officer Vazquez testified that, as they did so, Mr. Flythe's demeanor changed and Mr. Flythe began playing with his jacket, prompting Officer Vazquez to ask whether Mr. Flythe "ha[d] anything on [him] that [Officer Vazquez] should know." *Id.* at 402–03 (deposition of Angel Vazquez). Officer Vazquez testified that Mr. Flythe answered in the affirmative, pulled out a knife and attempted to stab Officer Vazquez. *Id.* at 403. Officer Vazquez "pushed or kicked" Mr. Flythe, drew his firearm, and fired two shots before the gun jammed. *Id.* at 408–09. After clearing the jam, Officer Vazquez was able to fire two additional

---

7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

[2] The full trial transcripts have not been filed on the district court's docket, although they were included in the joint appendix the parties filed in the D.C. Circuit. Therefore, and for ease of reference, the Court will cite to the Joint Appendix for all documents or proceedings filed prior to the D.C. Circuit's remand. *See* Joint Appendix, *Flythe v. District of Columbia*, 791 F.3d 13 (D.C. Cir. 2014) (No. 14-7069).

shots, which he claimed missed Mr. Flythe. *Id.* at 409–10. Mr. Flythe then untied his dog, and ran down Kenyon Street. *Id.* at 410.

Contrary to Officer Vazquez's account, however, five other witnesses to the altercation all testified that they did not observe Mr. Flythe with a knife. *See id.* at 539–40, 543 (deposition of Mary Frances McCotter); *id.* at 532–33 (deposition of Sabrina Shapiro); *id.* at 549–50 (deposition of Janean Willard); *id.* at 555–56 (deposition of Jonathan L. Poole); *id.* at 560 (deposition of Linda Smith). Several even testified that Mr. Flythe's hands were raised, or that his palms were open and forward, suggesting that he could not have been carrying a knife. *See id.* at 543 (McCotter Dep.); *id.* at 533 (Shapiro Dep.); *id.* at 549 (Willard Dep.); *id.* at 555 (Poole Dep.). Those witnesses either testified to the same at trial or had the relevant portions of their deposition testimony read into evidence. *See, e.g.*, *id.* at 1407–17 (portions of deposition of Linda Smith read into evidence); *id.* at 1420 (testimony of Mary Frances McCotter); *id.* at 1429, 1431 (testimony of Janean Willard); *id.* at 1435, 1444 (testimony of Jonathan Poole); *id.* at 1448 (testimony of Sabrina Shapiro).

Meanwhile, Officer Eagan had been patrolling the same neighborhood, accompanied by Mr. Hundal. He heard the following over the police radio:

| | |
|---|---|
| OFFICER [Vazquez]: | Eagan. Four hundred block of Kenyon. |
| OFFICER: | Hey, (inaudible), copy. |
| DISPATCHER: | 3206 (phonetic). |
| OFFICER: | Drop the knife. |
| OFFICER: | Shot. |
| OFFICER: | Drop the knife. |
| (Shot fired) | |
| . . . | |
| OFFICER: | Tried to stab me, ma'am. My gun jammed. |
| Get official on this location. | |

*Id.* at 222–23 (radio run call). In response, Officer Eagan drove around the block and proceeded toward Kenyon Street. *Id.* at 731–32 (deposition of Travis Eagan). Officer Eagan testified that,

while he was driving northbound on Warder Street, he saw Officer Vazquez running westbound. *Id.* at 732.  Officer Vazquez's weapon was out, he was pointing, and he said that Mr. Flythe was "running westbound." *Id.*  Officer Eagan testified that he looked westbound—down the 500 to 600 block of Kenyon Street—and "saw the suspect running on the north sidewalk in a westbound direction with the dog." *Id.*  Officer Eagan then turned left down Kenyon Street and proceeded forward, eventually parking his car near the 600 block, in order to cut off Mr. Flythe. *Id.* at 733. Officer Eagan ordered Mr. Flythe to "get on the ground . . . now[.]" *Id.*

Officer Eagan testified that, instead of obeying his command, Mr. Flythe ran past him in close proximity for three to four feet before "Mr. Flythe jumped through the air and changed his momentum by doing a hop . . . and [then] started coming towards" Officer Eagan. *Id.* at 734. Officer Eagan stated that he began retreating, but that Mr. Flythe "made a motion toward his waistband and [Eagan] saw a silver blade of what [he] believed to be a knife coming up out of his waistband." *Id.*  Officer Eagan described how Mr. Flythe was holding his weapon as follows: "He [was] holding it in a fashion so that if the handle were—if the knife were vertical, the blade was pointing down and the handle up, he had the handle grasping it from the top so that if you were to bring your thumb back to your shoulder, the handle would be toward your shoulder and the blade of the knife would be forward of you." *Id.* at 736.  At trial, Officer Eagan testified that Mr. Flythe raised the knife above his head. *See id.* at 1663 ("He raised it above his head and advanced towards me."); *id.* at 1671 ("He raised the knife above his head and was running at me.").  At that point, Officer Eagan stated that "I was ordering him to drop the knife, I'll shoot, drop the knife, I'll shoot. He continued to advance towards me. I discharged my weapon . . . ." *Id.* at 428.  Mr. Flythe fell to the ground. *Id.*

During the altercation between Officer Eagan and Mr. Flythe, Mr. Hundal remained in the parked patrol car.  Although much of his view was obstructed by the other cars parked on Kenyon Street, *see* J.A. at 1758–60, he claimed that at the critical moment at issue here—around the time he heard the gunshots—he could see the tops of Mr. Flythe's and Officer Eagan's heads and their shoulders, *id.* at 518–19 (deposition of Balbir Hundal); *id.* at 1760 (trial testimony).  His testimony regarding when Officer Eagan fired is inconsistent, however.  At one point during his deposition he stated that, when the shots were fired, Mr. Flythe and Eagan were "face to face."  *Id.* at 508, 519.  At another point, however, he appears to claim that Officer Eagan exited the patrol car and shot at Mr. Flythe while chasing him.  *Id.* at 517 ("Q: Was he still running when he fired his gun? A: Running still, yes."); *id.* at 1760 (trial testimony: "Q: Before he came face-to-face with the policeman, had you heard any gunshots? A: Yes, I heard gunshots . . . I heard that when they running . . . .").

Ursula Edmonds, another witness to the shooting, was standing on the west end of the Kenyon Street block, almost at the intersection with Georgia Avenue.  In her initial police interview, she stated that as soon as Officer Eagan's car pulled up to Mr. Flythe, "the police officer . . . immediately jumped out of the car, ran, started running, and I saw him chasing another gentleman."  J.A. at 580 (transcript of police interview).  She then stated: "he is chasing him and I heard, I hear [sic] two gunshots, pop, pop."  *Id.* at 581.  Ms. Edmonds stated that she "couldn't see where the gunshots came from," although she presented her "opinion" that "the police officer was shooting at the young man."  *Id.*  At trial, however, Ms. Edmonds claimed that she saw Mr. Flythe run and then hide "behind a pole," and that Officer Eagan "pulled up" to Mr. Flythe, "jumped out of his vehicle," "immediately pointed his gun," and "went straight to him and shot him."  *Id.* at 1481–82 (trial testimony).  When presented with her prior statement in

which she claimed not to have seen where the gunshots came from, Ms. Edmonds eventually admitted that it was possible she reported during her interview that she had not seen where the gunshots came from, but maintained during her in-court testimony that "I absolutely know where the gunshot came from." *Id.* at 1499–1500. The videotape of Ms. Edmonds initial interview was played for the jury as impeachment evidence. *Id.* at 1507.

Officer Vazquez, meanwhile, testified that he was not sure whether Mr. Flythe had stopped running or not before Officer Eagan fired shots at him. He stated, "I know he was not stopped but I don't know if he was running—walking, I mean, he was towards Officer Eagan." J.A. at 414. He also indicated that "prior to the shot [being fired]," he did not ever see Mr. Flythe stop running. *Id.* at 413. Finally, Ivan Cloyd, another bystander, reported during a police interview that he saw Mr. Flythe "running when the officer was shooting at him." J.A. at 577. At trial, Mr. Cloyd again said that he saw both men from across Kenyon Street and that he saw the officer shoot two shots at Mr. Flythe, and agreed that the officer was chasing Mr. Flythe. *See* J.A. at 1472–73.

Mr. Flythe was taken to the hospital, where he died as a result of bullet wounds to his torso and thigh. *See* J.A. at 443 (autopsy report). A knife was recovered near Mr. Flythe's body in the snow, but his fingerprints were not linked to the knife. *Id.* at 440–41 (deposition of Raymond E. Bond). Both Mr. Cloyd and another witness, Demetrius Moore, testified that they did not see a knife nearby Mr. Flythe's body when they observed the scene. *Id.* at 1474 (Cloyd trial testimony); *id.* at 584 (deposition of Demetrius Moore).

In November 2010, Mr. Flythe's mother, Betty S. Flythe, filed this action in her personal capacity and on behalf of Mr. Flythe's estate against the District, Officer Vazquez, and Officer Eagan. *See generally* Compl., ECF No. 1. Against the officers, Ms. Flythe's complaint alleged

constitutional claims of excessive force under 42 U.S.C. § 1983 and common law claims for assault and battery. Ms. Flythe also brought additional vicarious assault and battery claims and negligent hiring, training, and supervision claims against the District, as the officers' employer. *See* Am. Compl. ¶¶ 13–22, ECF No. 17.

The defendants moved for summary judgment, which the Court granted in part and denied in part. As relevant here, the Court granted Officer Eagan's motion for summary judgment, concluding that it was "objectively reasonable" for Officer Eagan to "believe that Mr. Flythe posed a threat to him of serious physical harm" at the time he fired his weapon. *Flythe I*, 994 F. Supp. 2d at 66–67. The Court noted that none of the other eyewitnesses could see whether Mr. Flythe had a knife when he encountered Office Eagan and, therefore, that Ms. Flythe had not placed Officer Eagan's "version of events into material dispute." *Id.* at 68. Regardless, the Court concluded that "whether or not Mr. Flythe actually brandished a knife . . . is largely irrelevant," because "it was objectively reasonable for Officer Eagan to believe that Mr. Flythe had a knife and was dangerous," and, therefore, he was protected by both qualified immunity for purposes of section 1983 and common law privilege for purposes of the assault and battery claim. *Id.* at 68, 74.

The Court allowed the claims against Officer Vazquez and the vicarious liability claim against the District for the conduct of *both* Officer Vazquez and Officer Eagan to proceed to trial, however. *See id.* at 74–76; *Flythe II*, 4 F. Supp. 3d at 221. Specifically, the Court held that because there was "a genuine dispute of material fact as to whether Mr. Flythe presented a danger throughout the encounter *with both officers*," summary judgment was not appropriate on Ms. Flythe's claim against the District for assault and battery. *Flythe I*, 994 F. Supp. 2d at 76. The Court emphasized that it would "assess both officers' encounter with Mr. Flythe as a whole,

constituting a single transaction," *id.* at 75, a point the Court reiterated in the course of resolving

Ms. Flythe's motion to alter or amend the judgment, *see Flythe v. District of Columbia*, 19 F.

Supp. 3d 311, 321 n.8 (D.D.C. 2014) (explaining that "the District is responsible for the acts of

both its employees," and that its "liability in this case cannot be viewed in a vacuum, with the

Court examining each officer's liability separately and detached from the other").

At trial, the jury found Officer Vazquez liable for assault (but not battery or excessive

force), and found the District of Columbia liable "for assault and battery, for the actions of *both*

Officer Vazquez and Officer Eagan." J.A. at 2398–99 (jury verdict form) (emphasis added).

The jury awarded compensatory damages in the amount of $187,300 against the District (but

none against Officer Vazquez). *Id.* at 2400. After offsetting the amount of a medical lien,

judgment was entered for Ms. Flythe in the amount of $119,253.24. *See* Order Granting Defs.'

Mot. for Setoff, ECF No. 122; Clerk's Judgment, ECF No. 123.

On appeal, the D.C. Circuit affirmed the jury's verdict but reversed the grant of summary

judgment in Officer Eagan's favor. The circuit noted that apprehension of a suspect through

deadly force is a Fourth Amendment seizure, and thus unlawful, unless that use of force is

"objectively reasonable in light of the facts and circumstances confronting" the officer. *Flythe

III*, 791 F.3d at 18 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). As a result, the

circuit determined that the resolution of qualified immunity—and thus summary judgment—

turned on whether Mr. Flythe attacked Eagan with a knife when he turned to face the officer, or,

instead, "obeyed Officer Eagan's command to 'stop' and turned around to surrender." *Id.* at 19.

In other words, summary judgment is proper only if, "after viewing the facts in the light most

favorable to Ms. Flythe and drawing every reasonable inference in her favor," the court is able to

conclude "that no rational trier of fact could disbelieve Officer Eagan's account." *Id.* The circuit

further clarified that in the particular circumstances where the witness most likely to contradict an officer's story is dead—and where direct evidence is thus absent—an award of summary judgment "'may be made only with particular care.'"  *Id.* (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)).  The court "'may not simply accept what may be a self-serving account by the police officer.'"  *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  Rather, and with particular emphasis on circumstantial evidence, the court "must 'carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'"  *Id.* (quoting *Scott*, 39 F.3d at 915).

And the circuit identified several instances in which the record evidence provided reason to doubt Officer Eagan's testimony.  Among those instances, the court noted that several individuals had testified that the altercation between Officer Eagan and Mr. Flythe began when Mr. Flythe was running *from* Officer Eagan as the officer shot at him.  *See id.* at 20.  In addition, although Officer Eagan maintained that Mr. Flythe had changed course and jumped through the air, causing Officer Eagan to retreat, Mr. Hundal—who had a clear view of Mr. Flythe's head and shoulders—did not report a mid-air change of direction or a retreat by Officer Eagan.  *Id.* And, while Officer Eagan testified that Mr. Flythe raised a knife above his head when he advanced toward him, neither Mr. Hundal nor Officer Vazquez mention that fact.  *Id.*  The circuit also noted that all five witnesses to Officer Vazquez's altercation with Mr. Flythe testified that he had no knife at all.  *Id.* at 21.  Because "[j]ustification for deadly force exists only for the life of the threat," the circuit reiterated that the fact that Mr. Flythe may have at one point posed a threat to Officer Vazquez did not automatically mean that Officer Eagan was justified in using deadly force.  *Id.* at 22.  Ultimately, the circuit found that "a reasonable jury could conclude" from the evidence "that Tremayne Flythe never threatened Officer Eagan with a knife."  *Id.*

On remand, Officer Eagan has again moved for summary judgment, arguing that the circuit's understanding of the record was "incomplete and inaccurate in significant respects," and that, regardless, the evidence presented at trial demonstrated that summary judgment was appropriately granted. *See* Mem. P. & A. Supp. Travis Eagan's Post-Remand Mot. Summ. J. at 3–4 ("Def.'s Mem. Supp. Summ. J."), ECF No. 150-1.  He also moves for summary judgment on the ground that there is insufficient evidence from which a jury could award punitive damages. *See generally* Mem. P. & A. Supp. Def. Eagan's Mot. to Dismiss Pl.'s Demand/Claim for Punitive Damages or for Summ. J. ("Def.'s Mem. Punitive Damages"), ECF No. 151-1.

## III.  LEGAL STANDARD

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See id.* at 323.  In response, the non-movant must point to specific facts in the

record that reveal a genuine issue that is suitable for trial. *See id.* at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

### A. Summary Judgment as to Officer Eagan's Liability

Officer Eagan first argues that the Court should again grant summary judgment in his favor and find that qualified immunity and common law privilege protected his actions. The Court disagrees, particularly in light of the D.C. Circuit's reversal.

First, it would violate the mandate rule for this Court to conclude that summary judgment is warranted even after the D.C. Circuit reversed the Court's prior entry of summary judgment. An "inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948). Accordingly, the district court is "bound by the mandate of a federal appellate court . . . and, generally, is without power to reconsider issues decided on a previous appeal." *Maggard v. O'Connell*, 703 F.2d 1284, 1289 (D.C. Cir. 1983). This principle, referred to as the "mandate rule," acts as "a 'more powerful version' of the law-of-the-case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 596–97 (D.C. Cir. 2001) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 n.3 (D.C. Cir. 1996)).

Here, the D.C. Circuit reversed this Court's grant of summary judgment to Officer Eagan, finding that the record evidence could lead a reasonable jury to "conclude that Tremayne Flythe never threatened Officer Eagan with a knife" and, therefore, that Officer Eagan's actions were not objectively reasonable or protected by common law privilege. *Flythe III*, 791 F.3d at 22. It would violate the mandate rule to now find that there is no genuine dispute that Officer Eagan acted reasonably, notwithstanding the circuit's conclusion. To the extent Officer Eagan argues that the D.C. Circuit's recitation of the record evidence was "incomplete and inaccurate in significant respects," *see* Def.'s Mem. Supp. Summ. J. at 3; *see also, e.g.*, *id.* at 3 n.1, 5 n.2, 9 n.3, 10 n.4, 14 n.7, this Court is without authority to overrule the circuit's judgment. Officer Eagan also raised many of these issues in his petition for rehearing and rehearing *en banc*. *See, e.g.*, Travis Eagan's Combined Pet. Reh'g *en banc* & Panel Reh'g at 7, *Flythe v. District of Columbia*, 791 F.3d 13 (D.C. Cir. 2015) (No. 14-7069) ("Eagan's Reh'g Pet.") (listing six types of evidence the circuit allegedly "misunderst[ood]," "mischarateriz[ed]" or "erroneously relied upon"). That petition was denied.

In an effort to claim otherwise, Eagan argues that his motion is now based on the evidence adduced at trial, which he asserts "differs in significant respects from the pretrial evidence." Def. Eagan's Reply Supp. Summ. J. at 2, ECF No. 160. But, while Eagan claims that trial evidence now tips the balance, that evidence (and the full trial record) was before the circuit. The circuit in fact considered it: in at least one instance the panel cited to Eagan's trial testimony in the course of reversing this Court's summary judgment decision. *See Flythe III*, 791 F.3d at 20 (quoting Eagan's trial testimony that Mr. Flythe raised the knife above his head). Because the circuit had the full record before it, and reviewed and affirmed the jury trial and verdict, the

circuit implicitly—if not explicitly—considered that evidence.[3]  Whether a motion for summary judgment was properly granted is a pure question of law (which is why it is reviewed *de novo*), and this Court is without authority to jettison the circuit's determination.  *See Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1079 (D.C. Cir. 1998) (explaining that review is *de novo* because the circuit "must decide the *same question* that was before the district court" (emphasis added)).

Second, and in any event, Officer Eagan's arguments on the merits are unavailing.  Even considering both the full summary judgment and trial record, disputed questions of fact remain.  Ms. Flythe's section 1983 claim alleges that her son was killed in violation of the Fourth Amendment.  Qualified immunity protects law enforcement officers from liability for constitutional claims falling on the "sometimes hazy border between excessive and acceptable force," *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks and citation omitted), unless "it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct," *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks and citation omitted).  When the use of deadly force to seize a suspect is involved, the Supreme Court has consistently held that "it is not constitutionally unreasonable to prevent escape" of a suspect if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others."[4]  *Tennessee v.*

---

[3] Indeed, in his petition for rehearing, Eagan argued that the circuit should *not have* considered the trial testimony in reversing this Court's summary judgment determination.  *See* Eagan's Reh'g Pet. at 12 ("The trial occurred months after the grant of summary judgment; the panel should not have considered trial testimony.").  Eagan cannot have it both ways, arguing on the one hand that the circuit improperly considered trial testimony and then arguing, on the other, that this Court should now consider that evidence, and should come to a different conclusion than the circuit.

[4] Eagan points to several other cases which he claims present similar facts and in which the Supreme Court or the D.C. Circuit granted qualified immunity to police officers either

*Garner*, 471 U.S. 1, 11 (1985); *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) (explaining that the relevant "question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them" (internal quotation marks and citation omitted)).  The question of common law privilege under D.C. law requires a similar analysis, which asks whether the means of force "employed are . . . in excess of those which the actor reasonably believes to be necessary." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993).

Accordingly, as the D.C. Circuit recognized, the operative inquiry for purposes of summary judgment in this case is determining what happened when Mr. Flythe turned to face Officer Eagan; if he turned to attack Officer Eagan with a knife, then Officer Eagan "reasonably responded to an imminent threat," but if Mr. Flythe turned around to surrender and obeyed Officer Eagan's commands to stop—or if he was otherwise no longer threatening—Officer Eagan's actions were "patently unreasonable." *Flythe III*, 791 F.3d at 19, 21–22.  Moreover, the circuit has now clarified how a court should analyze that factual inquiry when an officer is the only surviving witness of a deadly encounter.  The Court must "carefully examine all the

---

because the court found that there was no constitutional violation, or because the purported constitutional violation was not clearly established.  All of those cases, however, are distinguishable on their facts—and most were decided before the circuit issued its opinion in this case.  Indeed, several involved a dangerous motorist behind the wheel of a car in either a high speed chase or in an area where the individual posed a continuing risk to other bystanders or police officers.  *See, e.g.*, *Mullenix v. Luna*, 136 S. Ct. 305 (2015); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Fenwick v. Pudimott*, 778 F.3d 133 (D.C. Cir. 2015).  As the D.C. Circuit even explained in one of those cases, "[o]utside the context of a dangerous high-speed car chase, deadly force, as the Supreme Court made clear in *Garner*, ordinarily may not be used to apprehend a fleeing suspect who poses no immediate threat to others—whether or not the suspect is behind the wheel." *Fenwick*, 778 F.3d at 139–40 (internal quotation marks and citations omitted).  And, here, there is a predicate question of fact concerning whether Mr. Flythe *did* continue to pose an immediate threat.  Thus, the cases Eagan cites do not support his position, given the circumstances of this case.

evidence in the record," including available circumstantial evidence, "to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* at 19 (quoting *Scott*, 39 F.3d at 915) (internal quotation marks omitted).  That basic inquiry also should not change if the Court considers evidence adduced at trial.  The summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.  Thus, "if reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed," nor should summary judgment be granted. *Id.*

With that clarified inquiry in mind, several pieces of circumstantial evidence cast doubt on Officer Eagan's account, and could lead a reasonable jury to question whether Mr. Flythe was attacking Officer Eagan or posed a continuing threat to him as he turned to face the officer.  The Court need not canvass all of the parties' contentions, but focuses on a few that make the point.

Most importantly, and as the D.C. Circuit recognized, what exactly took place between Officer Eagan and Mr. Flythe is uncertain, given the circumstantial evidence. *See Flythe III*, 791 F.3d at 22.  That confrontation is the crux of this case. *See id.*  Officer Eagan claimed that Mr. Flythe ran past his cruiser than, after several feet, did a slight hop in midair, turned back toward the officer, and raised a knife above his head in a threatening manner. *See* J.A. at 734.  But the testimony of other witnesses conflicts with that story.  For example, although much of his view was obscured by parked vehicles, Mr. Hundal testified that he had a clear view of Mr. Flythe's and Officer Eagan's shoulders and heads from inside the officer's cruiser. *See id.* at 518–19, 1760.  While he testified that he saw the men come face to face, he never mentioned Flythe making a hopping movement. *See Flythe III*, 791 F.3d at 20.  The same is true for Ms. Edmonds

and Mr. Cloyd, who both saw portions of the encounter, albeit from a distance, and stated in police interviews that they saw Officer Eagan *chasing* Mr. Flythe while firing at him. J.A. at 577, 580–81; *see also Flythe III*, 791 F.3d at 20. Mr. Cloyd reiterated this account at trial.[5] J.A. at 1472–73. These statements might suggest that the encounter began with Officer Eagan chasing and shooting at Mr. Flythe, not with Mr. Flythe turning threateningly toward Officer Eagan. And, if a reasonable jury disbelieves Officer Eagan's version of how the encounter began, it might also disbelieve his potentially self-serving account of how it ended.

Mr. Flythe's wielding of the knife is also of critical importance. Officer Eagan testified that Mr. Flythe raised the knife above his head after he turned toward Officer Eagan. Yet, no other witnesses testified to that sort of motion. Mr. Hundal could see the men's head and shoulders, and Officer Vazquez testified to a "motion" Mr. Flythe made toward Officer Eagan. *See* J.A. at 518–19, 1760, 413. But neither testified that Mr. Flythe raised the knife above his head as he approached Officer Eagan. *See Flythe III*, 791 F.3d at 20. In addition, every person other than Officer Vazquez to witness his initial encounter with Mr. Flythe testified that he or she did not see Mr. Flythe with a knife. *See, e.g.*, J.A. at 532–33, 539–40, 543, 549–50. Several even said that Mr. Flythe's palms were open and his hands were raised, suggesting even more clearly that he was not grasping a knife. *See, e.g.*, *id.* at 533, 543, 549. When coupled with the

---

[5] Officer Eagan argues that Mr. Cloyd's testimony at trial "differed significantly" from his police interview, but the Court has compared the two and does not perceive any material differences—and Officer Eagan does not identify any with specificity. *See* Def.'s Mem. Supp. Summ. J. at 3 n.1. Ms. Edmonds, for her part, completely repudiated at trial the statement she had previously provided to the police directly following the confrontation. *See, e.g.*, J.A. at 1499–1500. She testified to a confrontation that was, if anything, less favorable to Officer Eagan. She was impeached at trial with her prior statement, and the video of her police interview was played for the jury. *See id.* at 1507. Although these discrepancies provide ample reason to doubt the veracity of her trial testimony, it is within the jury's province to make that type of credibility assessment.

other evidence, this circumstantial evidence could lead a reasonable jury to conclude that Mr.

Flythe either did not carry a knife, or did not wield it in a threatening manner at the time he

encountered Officer Eagan.[6]  If the jury so concluded, they could further find that Officer

Eagan's story was not "internally consistent" or "consistent with other known facts." *Flythe III*,

791 F.3d at 19 (internal quotation marks omitted) (quoting *Scott*, 39 F.3d at 915).

For the most part, Officer Eagan again slips back into arguing that no other witness

actually saw the encounter.  As the circuit explained, however, that is not dispositive.  *See Flythe*

*III*, 791 F.3d at 19.  The Court must consider what conclusions the jury might reasonably draw

about Officer Eagan's account in light of the other, circumstantial evidence that conflicts with

his account.  *Id.*  In the Court's view, the inferences the circuit identified do not cross the

boundary from supportable inference to unsupportable speculation.  The remaining issues that

Officer Eagan identifies—including the fact that Mr. Cloyd, Mr. Hundal, and Ms. Edmonds saw

---

[6] The circuit emphasized that at least one witness at the scene, Ms. Moore, did not see a knife as she observed Mr. Flythe's body, and that Mr. Flythe's fingerprints were not found on the knife that was recovered. *See Flythe III*, 791 F.3d at 20–21. In addition, although the knife was swabbed for DNA, that sample was never tested. *See id.* at 21. Ms. Flythe's statement of material facts argue that these circumstances suggest a conspiracy to plant the knife. *See, e.g.*, Pl.'s SUMF ¶¶ 56–57. One need not necessarily credit that conspiracy theory, however, to find a genuine issue of fact. A reasonable jury might infer from this circumstantial evidence that, even if the recovered knife *was* Flythe's, the fact that the knife was not immediately apparent on the scene or that Mr. Flythe's fingerprints were not found on the knife indicate that, perhaps, he never removed it from his jacket or waistband during his confrontation with Officer Eagan. Alternatively, it could be that an abandoned knife was fortuitously found nearby. The Court acknowledges that there is ample evidence from which a jury could reasonably conclude that Mr. Flythe carried a knife—including Vazquez's radio call referencing being stabbed (if found credible), Officer Eagan's testimony (if found credible), and the recovery of the knife close to Mr. Flythe's body. *Accord Flythe III*, 791 F.3d at 22 (noting that "a jury could conclude" that Mr. Flythe "threatened Officer Eagan with a knife"). But there is also sufficient circumstantial evidence, including the testimony of five witnesses who did not see Mr. Flythe carrying a knife during his confrontation with Officer Vazquez, that would allow a rational jury to conclude either that Mr. Flythe did not carry a knife or, alternatively, that the knife was not readily accessible to him as he met Officer Eagan.

only portions of the encounter or had obstructed views, *see, e.g.*, Def.'s Mem. Supp. Summ. J. at 10–11; Def.'s Reply Supp. Summ. J. at 9, or that Ms. Moore could not recall whether there was snow on the ground and was not actively looking for a knife, *see* Def.'s Mem. Supp. Summ. J. at 21 n.8—are all considerations that the jury must weigh in determining whether to find particular witnesses or their testimony credible.  Those issues are not reasons to discount the witnesses' respective testimonies in their entirety.

Finally, Officer Eagan continues to claim that, "regardless of whether Flythe had the knife," he "would be entitled to qualified immunity even if Flythe had not attacked Eagan with the knife which was found at Flythe's feet."  Def.'s Mem. Supp. Summ. J. at 4–5; *see also id.* at 11 n.6 ("[E]ven if Flythe had not brandished a knife, Eagan's actions would still have been lawful and objectively reasonable.").  The circuit *expressly* rejected this contention.  It held that: "whether Eagan acted reasonably *does* turn on whether, as he alleges, Flythe attacked him with a knife."  *Flythe III*, 791 F.3d at 22 (emphasis in original).

Nor is it sufficient for Officer Eagan to continually argue that he had probable cause to use deadly force based on what he *subjectively* believed as a result of Officer Vazquez's call and his assumptions about Officer Vazquez's encounter with Mr. Flythe.  The Supreme Court has rejected a subjective test for qualified immunity, and "[t]he relevant inquiry in a constitutional excessive force claim . . . is 'whether the officers' actions are 'objectively reasonable' *in light of the facts and circumstances confronting them*, without regard to their underlying intent or motivation.'"  *Scott v. District of Columbia*, 101 F.3d 748, 758 (D.C. Cir. 1996) (emphasis added) (quoting *Graham*, 490 U.S. at 397); *see Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force

constitutional."). Determining whether Officer Eagan's actions were objectively reasonable requires understanding both what Officer Eagan *believed* as he approached Mr. Flythe, as well as the situation he *in fact faced* after Mr. Flythe turned back toward him—and what a reasonable officer would have done when confronted with those circumstances. *See Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (explaining that D.C. law's privilege inquiry "is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation."). The fatal flaw in Officer Eagan's reasoning is, again, his assumption that those factual circumstances are beyond dispute.

Where, as here, "the material facts underlying a defendant's claim of qualified immunity are in dispute, 'it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law.'" *Estate of Gaither v. District of Columbia*, 655 F. Supp. 2d 69, 98 (D.D.C. 2009) (quoting *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 20, 22 (D.D.C. 2007)). "[I]f an excessive force claim turns on which of two conflicting stories best captured what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official." *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008) (quoting *Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring)) (declining to grant summary judgment where the question of whether the plaintiff's "prone position was threatening or suggested escape . . . can only be resolved by evaluating the conflicting testimony" of the plaintiff and the officer). Accordingly, Officer Eagan's motion for summary judgment must be denied.

### B.  Summary Judgment as to Punitive Damages

Having concluded that genuine disputes of fact concerning Officer Eagan's liability remain, denial of Officer Eagan's motion for summary judgment as to punitive damages largely follows.  Under section 1983, punitive damages may be assessed when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). District of Columbia law is similar, requiring a plaintiff to show that both the defendant's conduct and his state of mind evidenced "malice or its equivalent." *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995).  Such malice is shown by commission of a tortious act "accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's right[s], or other circumstances tending to aggravate the injury." *Id.* (quoting *Wash. Med. Ctr. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990)) (internal quotation mark omitted). The jury "can infer the requisite state of mind from the surrounding circumstances; indeed, it is usually impossible to do otherwise, for direct evidence of that state of mind is rare." *Jemison v. Nat'l Baptist Convention, USA, Inc.*, 720 A.2d 275, 285–86 (D.C. 1998).[7]

---

[7] Officer Eagan argues that this showing must be made by clear and convincing evidence. The District of Columbia Court of Appeals has held as much for purposes of D.C. law, but the preponderance standard is typically applied in section 1983 cases under federal law.  *See Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995) (holding that the egregiousness of the defendant's conduct and state of much must be shown by clear and convincing evidence); *Stanley v. Irsa*, No. 2:08-cv-195, 2011 WL 1526937, at *1–2 (N.D. Ind. Apr. 15, 2011) (collecting cases applying preponderance standard for purposes of section 1983); *see also Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 n.11 (1991) (noting that the Court had considered the defendant and amici's arguments that "a standard of proof of punitive damages higher than 'preponderance of the evidence'" should apply but was "not persuaded . . . that the Due Process Clause requires that much").  In fact, at trial in this case, the Court instructed the jury only on the lower preponderance standard, after concluding that it would be unlikely for the jury to find liability for Officer Vazquez on the assault and battery count but not on the section 1983 count.  *See* J.A. at 2058–60 (jury instruction conference, during which the District's attorney conceded that the preponderance standard applied as a matter of federal law); J.A. at

Officer Eagan claims that Mr. Flythe "did not say or do anything to indicate that he was surrendering before he suddenly turned to face Eagan," and that "[r]egardless of whether [Mr.] Flythe attacked Eagan with a knife, it was not outrageous for Eagan to fire at [Mr.] Flythe, and there is not one scintilla of evidence that Eagan acted with any malice toward [Mr.] Flythe." Def.'s Mem. Supp. Punitive Damages at 11. But Officer Eagan once again relies only on his own view of the encounter. If the jury concludes that Mr. Flythe was unarmed or was not threatening toward Officer Eagan, and Officer Eagan nevertheless employed deadly force, a jury might be able to conclude that his conduct and state of mind support a punitive damages award. *See Jemison*, 720 A.2d at 285–86 (noting that a jury can consider the surrounding circumstances). Until the jury resolves what happened during the encounter, the Court is unable to conclude that there is insufficient evidence to support a punitive damages award.[8]

---

2386 (jury instructions requiring a showing of preponderance of the evidence). Officer Eagan, who was not a defendant in that trial, would of course be permitted to make a different objection at his trial. For purposes of resolving this motion, however, it suffices to say that the Court believes there is sufficient evidence to present the punitive damages question to the jury under either standard, in light of the contested issues of fact.

[8] Ms. Flythe alludes to evidence showing that Officer Eagan was "under the influence of illegal drugs" at the time he shot Mr. Flythe. Pl.'s Opp'n Mot. Summ. J. Punitive Damages at 9, ECF No. 159. Although Officer Eagan contends that no reasonable jury could conclude that he was under the influence of illegal drugs at the time of the shooting, *see* Def.'s Reply Punitive Damages at 4–5, ECF No. 161, the circuit pointed to evidence in the record showing: (1) that Officer Eagan tested positive for methamphetamines four days after the shooting, (2) that he took whatever substance contributed to the positive test result before the December 26, 2009 shooting, and (3) that the police department later fired him "after concluding that he lied about using illegal methamphetamines," *Flythe III*, 791 F.3d at 21. From this evidence, and other evidence in the record, a jury might be able to conclude that Officer Eagan was under the influence of illegal drugs at the time of the shooting. The Court does not foreclose the possibility that such evidence may be relevant to the punitive damages issue. The Court takes no position on the issue at this time, however, because neither party cites any authority discussing whether the use of illegal drugs, or other analogous circumstances, can contribute to establishing the malicious state of mind necessary to support a punitive damages award.

In addition, Officer Eagan contends that because the jury verdict form treated "the actions of Vazquez and Eagan . . . as a single cause of action," and the jury decided not to award punitive damages against Vazquez, a punitive damage award against Officer Eagan is "precluded." Def.'s Reply Punitive Damages at 2, ECF No. 161.  This argument misunderstands both the jury form and the jury's verdict.  The special verdict form only indicated that the liability of *the District* as respondeat superior was predicated on both officers' conduct.  And punitive damages are not available against the District.  Therefore, when the jury declined to award punitive damages against Officer Vazquez for his own section 1983 violations and assault and battery, it had no occasion to consider an award of punitive damages against Officer Eagan for his own conduct.

Consequently, the Court will also deny Officer Eagan's motion for summary judgment as to the issue of punitive damages.

### C.  The District's Status

The District claims that it is no longer a party defendant in this case, in light of the jury's award in the first trial.  *See* D.C.'s Br. Regarding Non-Status at 1–2, ECF No. 152.  The Court agrees.

As the Court determined in its summary judgment decision, and reiterated in the course of resolving Ms. Flythe's motion to alter or amend the judgment, Ms. Flythe's vicarious assault and battery claim against the District would be assessed based on "both officers' encounter with Mr. Flythe as a whole, constituting a single transaction."  *Flythe I*, 994 F. Supp. 2d at 75; *see also Flythe v. District of Columbia*, 19 F. Supp. 3d 311, 321 n.8 (D.D.C. 2014).  Ms. Flythe never disputed that ruling.  Immunity and vicarious liability are not necessarily co-extensive. "While immunity that protects an employee may also shield the employer from liability, a

finding of no civil liability on the part of an employee because of an immunity doctrine may not shield the employer, for the doctrine of respondeat superior operates by imputing to the employer *the acts of the tortfeasor, not the tortfeasor's liability*." 27 Am. Jur. 2d *Employment Relationship* § 367 (2016) (emphasis added). Thus, "unless there is an independent source of immunity for the employer or principal, the cause of action premised on vicarious liability can be brought even if the employee or agent is entitled to immunity." *Id.*; *cf.* 1 Stuart M. Speiser *et al.*, *The American Law of Torts* § 3.9, at 540–41 (2013) (explaining that "the few existing case authorities support the position that one of [multiple] joint tortfeasors is not relieved from liability because another has a personal privilege").

Accordingly, at trial, the jury was asked to consider the District's liability as *respondeat superior* for *both* officers. Even though the Court had concluded that Officer Eagan was immune and privileged in his individual capacity, the jury still considered his conduct as part of determining the District's own liability. Officer Eagan testified at length, which allowed the jury to fully assess the issue. *See* J.A. at 1649–83, 1848–1936. And the special verdict form asked the jury whether Ms. Flythe had proven "by a preponderance of the evidence that the District of Columbia is liable for assault and battery, *for the actions of both Officer Vazquez and Officer Eagan*." *Id.* at 2399. Ms. Flythe did not object to that form. *See* J.A. at 2208–09 ("I don't think we have a problem with [the Court verdict form]."). The jury found the District liable. *See id.* at 2399.

As a result, the first trial fully resolved the District's liability. The jury found the District vicariously liable for the conduct of *both* Officer Vazquez and Officer Eagan, and the D.C. Circuit affirmed. *See Flythe III*, 791 F.3d at 18 (noting that "the jury found . . . the District vicariously liable for assault and battery committed by both officers"); *id.* at 15 ("[W]e affirm the

jury's verdict."). The District has now satisfied the judgment. To be sure, the D.C. Circuit's decision has revived the possibility that Officer Eagan will also be found liable in his own individual capacity; but Ms. Flythe does not get a second bite at the apple simply because Officer Eagan's own liability is now at play. Therefore, the Court concludes that the District is no longer a party defendant in this matter.

### D.  The Jury Verdict

Finally, Officer Eagan claims that the jury's verdict requires an entry of summary judgment in his favor because "Eagan's actions cannot be considered apart from Vazquez, and [the] plaintiff has been compensated for the combined actions of Vazquez and Eagan." Def.'s Mem. Supp. Summ. J. at 26. For the reasons explained above, the Court disagrees to the extent Officer Eagan claims that the question of his own *liability* was necessarily decided at the prior trial. Open questions remain regarding the circumstances he was confronted with, the resolution of which will determine whether he is protected from liability by qualified immunity or common law privilege. *See supra* Part IV.A. Nevertheless, the Court agrees that the issue of compensatory damages was fully determined at the prior trial.

Compensatory damages are awarded in order to "make plaintiffs whole for the harms that they have suffered as a result of defendants' actions." *Hendry v. Pelland*, 73 F.3d 397, 402 (D.C. Cir. 1996). A plaintiff seeking compensation for wrongs committed against him "should be made whole for his injuries, not enriched," and, therefore, "'in the absence of punitive damages, a plaintiff can recover no more than the loss actually suffered.'" *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011). This principle applies equally when there are multiple defendants. Under D.C. law, "multiple defendants found liable for a single injury are deemed to be joint tortfeasors, and any compensatory damages for that single injury must be awarded

jointly and severally against them." *Faison v. Nationwide Mortg. Corp.*, 839 F.2d 680, 686 (D.C. Cir. 1987); *see also Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (concluding, in section 1983 context, that "[i]t is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury").  And the plaintiff "can obtain *only a single recovery*, and each defendant will be entitled to a credit for any sum that the plaintiff has collected from the other defendant." *Faison*, 839 F.2d at 686–87 (emphasis added) (quoting *Leiken v. Wilson*, 445 A.2d 993, 999 (D.C. 1982)); *see also Watts*, 774 F.2d at 179 ("[T]he very nature of damages as compensation for injury suffered requires that once the plaintiff has been fully compensated for his injuries by one or more of the tortfeasors, he may not thereafter recover any additional compensation from any of the remaining tortfeasors.").

Here, by virtue of the fact that the jury was instructed to consider the entire course of conduct when determining the compensatory damage award, Ms. Flythe has been made whole for the entire injury.  Indeed, the Court instructed the jury to make a single damages award, stating that: "If you find that the plaintiff is entitled to receive monetary damages from more than one defendant, then you must award such monetary damages in a single amount against all defendants whom you find to be liable." J.A. at 2380.  And, as the Second Restatement of Judgments explains (with limited exceptions not applicable here): "[i]f two persons have a relationship such that one of them is vicariously liable for the conduct of the other, and an action is brought by the injured person against one of them . . . the judgment in favor of the injured person is conclusive upon him as to the amount of his damages." *Restatement (Second) of Judgments* § 51 (Am. Law Inst. 1982).  Thus, the verdict in favor of Ms. Flythe against the District, finding the District vicariously liable for Officer Eagan's conduct even though the Court

had concluded the officer was immune, encompassed the injuries Mr. Flythe and his estate

suffered as a result of Officer Eagan's actions.[9]  The plaintiff was made whole through that

award, which the circuit has now affirmed.

The Court acknowledges Ms. Flythe's argument that "the manner in which the Court

presented this case to the jury was in all respects over the objection of the plaintiff," and her

claim that she "objected to the jury instructions," and "the theories of liability that the Court

allowed to go forward."  *See* Pl.'s Opp'n to Def. Eagan's Mot. Summ. J. at 13 ("Pl.'s Opp'n"),

ECF No. 158.  Such generalized objections, however, are insufficient to raise an issue.  *See, e.g.*,

*Palmer v. Hoffman*, 318 U.S.109, 119 (1943) ("In fairness to the trial court and to the parties,

objections to a charge must be sufficiently specific to bring into focus the precise nature of the

alleged error.").  Ms. Flythe does note the distinction between the types of damages available in

wrongful death and survival actions.  Pl.'s Opp'n at 14.  But, as Ms. Flythe acknowledges, the

Court did instruct the jury on how to calculate damages for *both* types of claims, and those

instructions largely, and substantively, track the standard instructions she quotes.  *See* J.A. at

2382–83; Pl.'s Opp'n at 14.  Ms. Flythe nevertheless complains that the verdict form "made no

reference to either [type of action] nor did it set forth questions to the jury that were designed to

address amounts recoverable under either statute."  Pl.'s Opp'n at 14.  Yet, at trial Ms. Flythe did

not object to the form on that ground.  *See* J.A. at 2209.  Instead, it was the District—not Ms.

Flythe—that argued that the damages should be itemized into various categories.  *See id.* at

2208–09.  Ultimately, the Court decided to avoid making the verdict form needlessly

---

[9] The Court notes that the verdict form, perhaps erroneously, did ask the jury to make a
separate compensatory damages award for Officer Vazquez and the District, which conflicted
with the Court's instruction that the jury should make only a single monetary award against all
defendants.  No party raised this discrepancy, however—either at trial or in post-trial briefing.  In
any event, the jury did end up making a single damages award.

complicated, and any claim of error concerning the verdict form was open to Ms. Flythe on appeal.  As the D.C. Circuit concluded, to the extent she attempted to raise arguments about the jury instructions, she forfeited them, and there was no mention at trial or on appeal concerning a challenge to the special verdict form.  *See Flythe III*, 791 F.3d at 22.  Regardless, in light of the fact that the jury was fully instructed on the types of damages to take into account, the Court perceives no basis in the record to conclude that the jury did not properly award the damages it believed warranted for both the survival claim and the wrongful death claim.[10]

Nevertheless, contrary to Officer Eagan's position, Ms. Flythe's inability to recover additional compensatory damages does not render a new trial a hollow exercise (and does not mean that summary judgment should be granted in his favor).  Officer Eagan's liability remains to be determined.  If he is found liable, the District might be able to seek contribution for a portion of the damages award, to the extent the District would not indemnify him.[11]  In addition, it is still possible that a jury might conclude that punitive damages are warranted for Officer Eagan's conduct.[12]  As a result, Officer Eagan's motions must be denied notwithstanding the fact that a jury already awarded compensatory damages to Ms. Flythe.

---

[10] Ms. Flythe also argues that "there is nothing in the verdict form indicating that damages were awarded against the District for the actions of Officer Vazquez, Officer Eagan[,] or both."  Pl.'s Opp'n at 14.  This argument ignores both the nature of joint and several liability, and the fact that the jury was explicitly tasked with assessing the actions of *both officers* to determine the District's overall liability.  As already explained, it did not matter that Officer Eagan was immune; the District could still be liable for his conduct.  And the Court also notes that, despite the discrepancy caused by two compensatory damage lines, the fact that the jury awarded no compensatory damages against Officer Vazquez suggests that the jury believed that the $187,300 in damages they did award flowed largely from *Officer Eagan*'s actions.

[11] On the other hand, if the District declined to indemnify Officer Eagan, it could also choose to waive its right to contribution from Officer Eagan for a portion of the compensatory damages award.

[12] Recently, however, Officer Eagan's bankruptcy counsel informed the Court that Officer Eagan has filed for bankruptcy in the Western District of Virginia.  *See* Letter from Andrew J. Muzic, Esq., ECF No. 163.  This change in circumstances may make a trial an empty

## V.  CONCLUSION

For the foregoing reasons, Officer Eagan's motion for summary judgment (ECF No. 150)

is **DENIED** and Officer Eagan's motion for summary judgment as to punitive damages (ECF

No. 151) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  August 26, 2016                                    RUDOLPH CONTRERAS
                                                        United States District Judge

---

gesture, to the extent Officer Eagan does not have the assets necessary to satisfy any judgment.
As already noted, the District—although no longer a party in any event—also cannot be held
liable for punitive damages. *See Butera v. District of Columbia*, 235 F.3d 637, 658 (D.C. Cir.
2001) (explaining that under D.C. law punitive damages are not allowed against the District
absent "extraordinary circumstances"—a term of art describing situations not implicated in this
case); *see also* J.A. at 2387 (instructing the jury that punitive damages "are not allowed against
the District of Columbia, on either the federal or common law claims").